Filed 2/2/12

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S093754 |
| v. | ) | |
| | ) | |
| GARY GALEN BRENTS, | ) | |
| | ) | Orange County |
| Defendant and Appellant. | ) | Super. Ct. No. 96NF2113 |
| _____ | ) | |

Defendant Gary Galen Brents argued with Kelly Gordon over $100 in proceeds from a methamphetamine sale. Defendant tried to suffocate Gordon, and he choked her. Then he placed Gordon in the trunk of a borrowed car, drove her to a remote location, opened the trunk, poured gasoline on her, closed the trunk, poured gasoline on the outside of the trunk, and lit the gasoline on fire. Gordon burned to death, trapped in the trunk.

Defendant was charged with one count of first degree murder (Pen. Code, § 187, subd. (a)),[1] one count of kidnapping (§ 207, subd. (a)), and one count of assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(1)). Alleged were two special circumstances: that defendant committed the murder while engaged in a kidnapping offense (§ 190.2, subd. (a)(17)(B)), and that the murder was intentional and involved the infliction of torture (§ 190.2, subd.

---

[1] All further undesignated statutory references are to the Penal Code.

1

(a)(18)).  It was also alleged that defendant had three prior serious felony convictions within the meaning of the three strikes law (§§ 667, subds. (b)-(e), and 1170.12), and also within the meaning of the five-year enhancement statute (§ 667, subd. (a)), and that defendant had served five prior prison terms within the meaning of section 667.5, subdivision (b).  Defendant pleaded not guilty to the charged crimes and denied the special circumstance and enhancement allegations.  The trial court granted defendant's motion to bifurcate the trial on the prior convictions.

A jury found defendant guilty of the charged crimes, and it found true the kidnapping special circumstance.  The jury was unable to reach a verdict on the torture special circumstance; the trial court declared a mistrial on that allegation, and the prosecution later stated on the record that it would not retry the allegation.  After defendant waived his right to a jury trial on the prior conviction and prior prison term allegations, the trial court found all the prior conviction allegations true, and it found four of the five prior prison term allegations true.

At the penalty phase, the jury returned a verdict of death.  The trial court denied postverdict motions, including the automatic motion to modify the verdict.  The court sentenced defendant to death on the first degree murder conviction.  Applying the three strikes law (§§ 667, subds. (b)-(e), and 1170.12), the court imposed a consecutive 25-years-to-life term on the assault conviction; applying the five-year enhancement statute (§ 667, subd. (a)), the court imposed three consecutive five-year enhancements.  The court stayed the sentence on the kidnapping conviction and struck the prior prison term enhancements.

This appeal is automatic.  (Cal. Const., art. VI, § 11, subd. (a); § 1239, subd. (b).)  We affirm the convictions of first degree murder and the other charged felonies, but we reverse the judgment as to the penalty of death and set aside the

kidnapping special circumstance finding because the trial court erroneously instructed the jury.

## I. FACTUAL BACKGROUND

### A. Guilt Phase

#### 1. *Prosecution evidence*

##### *a. Defendant and his associates beat up Kelly Gordon*

In October 1995, defendant rented a room at a Travelodge motel in Anaheim and stayed there with Michelle Savidan, Abigail (Abby) Diaz, and murder victim Kelly Gordon. Savidan testified that on October 3d, defendant agreed to give her enough money to buy a quarter-ounce of methamphetamine, which she would then sell at a profit, returning the proceeds to defendant. Defendant gave Savidan the money, and Savidan returned with the methamphetamine. When she returned, Diaz and victim Gordon were with defendant. Gordon worked for defendant as a prostitute. Savidan had expected to sell all the methamphetamine herself, but defendant gave two grams to Gordon to sell.

That night, defendant and Gordon were stopped by City of Buena Park police officers in an area frequented by prostitutes. Police took a thumbprint from Gordon but did not arrest her or defendant.

On October 4th, defendant, Gordon, and Savidan met in defendant's motel room. According to Savidan, she had sold her portion of the methamphetamine, and she gave defendant the money. Gordon, however, did not have the two grams of methamphetamine that defendant had given her (worth about $100), nor did she have the money. Defendant and Gordon argued about the money. Diaz arrived later. Anna Sara Uele and Victoria (Vickie) Myers, who knew defendant, also came to the room, and they brought with them a woman named Jasmine (who died

3

before trial). Uele and Myers testified that Gordon was in the room, crying, when they arrived, and defendant was demanding the money she owed him. Savidan, Diaz, Uele, and Myers all testified about the events that transpired next.

At some point, Savidan told defendant that he should send Gordon away. Savidan offered to wait for Gordon in the parking lot of a nearby motel, beat her up, and tell her not to return. Defendant agreed to this plan, and Savidan left. Gordon then told defendant that she could get the money she owed him, and Uele offered to drive Gordon wherever she needed to go. Gordon, Uele, Myers, and Jasmine all went out to a blue Cadillac that Uele had borrowed from someone in exchange for drugs. Diaz remained behind. Defendant went to get Savidan, and they got into the Cadillac with the other four women. Uele drove a short distance and parked. The women dragged Gordon out of the car, beat her with their fists, and kicked her. Gordon was on the ground, bleeding from her nose and mouth.

Defendant then pulled Savidan aside and expressed an intent to kill Gordon for being a "snitch." Savidan returned to the motel room, where she found Diaz. Savidan told Diaz that they needed to get away from defendant, adding: "We [are] going to either end up dead or in jail."

Meanwhile, defendant, Gordon, Uele, Myers and Jasmine got back into the Cadillac. Defendant put a plastic bag over Gordon's head and tightened it around her neck. Gordon pulled the bag off. Defendant also choked Gordon from behind. Defendant then told Uele to open the trunk, and he put Gordon into the trunk, hit her, choked her, and closed the trunk. Uele and Myers asked defendant what he was doing. Defendant answered: "We got to take her out . . . because she w[ill] tell." Uele, Myers, and Jasmine decided to return to the motel room, and Uele gave the Cadillac keys to defendant. Defendant returned to the motel room briefly, washed blood off his hands, used the bathroom, and then left.

4

About two hours later, Savidan and Diaz and some other people were standing in front of the Stage Stop Motel, located about a half-mile from the Travelodge.  Defendant approached and said:  "I took her to the hospital."  Defendant then took Savidan away from the group and asked her:  "Now, if I took gasoline and I poured it all on the inside of the car and on the outside of the trunk, do you think the fire would reach the inside of the trunk?"

### b. Firefighters' discovery of Gordon's body in a burned blue Cadillac

At 10:48 p.m., on October 4, 1995, Los Angeles County firefighters responded to a report of a burning vehicle on Santa Fe Avenue, in an isolated industrial area near Lakewood, approximately 16 miles from defendant's motel room, but only three miles from the address on defendant's driver's license.  Firefighter Ken Salmans testified that when he arrived with the other firefighters, they discovered a late-model luxury car, light in color, with the trunk engulfed in flames.  After the fire was extinguished, Salmans opened the trunk and saw the dead body of a woman.  The body was severely burned, with particularly severe burns from the waist down.  Salmans also smelled gasoline vapors.  His opinion, based on the severity of the burns and the location of the fire, was that someone had poured gasoline directly on the woman.

Detective Barry Shapiro of the Los Angeles County Sheriff's Department arrived at the scene while the fire in the trunk of the car was still burning.  He testified that he was present when the trunk was opened.  He identified the car as a light blue Cadillac, and he described the burned body of the woman in the trunk.  The burns were particularly severe on the legs.  The body, which had the name "Kelly" tattooed over the left shoulder blade, was later identified by thumbprint to be that of Kelly Gordon, the woman stopped with defendant and thumbprinted on the night before the murder.

5

Sheriff's investigators discovered a blue plastic antifreeze container in the street near the car. The container smelled like gasoline. They also found rags that smelled like gasoline on the front passenger-side floorboard of the car. DNA taken from a cigarette butt found on the driver's seat of the car matched Uele's DNA; only 1 in 3,400 people in the general population would have those same DNA markers.

An arson expert ruled out an accidental cause of the fire and concluded that the fire was caused by igniting gasoline that had been poured inside the trunk, between the legs of the burned woman, and also on the top of the trunk. An autopsy discovered second- and third-degree burns covering 70 to 80 percent of Gordon's body, with particularly bad burns on the legs. It appeared that Gordon had suffered a bloody nose and a blunt force injury to the temple. She had an elevated carbon monoxide level in her blood, and soot was in her larynx, trachea, and lungs. These facts indicated that Gordon was alive when the fire was ignited and that she died from smoke inhalation and burns.

### c. Defendant's attempts to influence witnesses

While defendant was in custody, awaiting trial, investigators involved in a narcotics search of a motel room found a manila envelope addressed to Iris Hernandez, Diaz's mother, with defendant's name as the sender. The envelope contained several letters that bore defendant's fingerprints and were signed with defendant's street name, "Dragon." One letter was to Iris Hernandez, asking her to deliver the other letters, which were addressed individually to Diaz, Savidan, Uele, and Myers.

The letters instructed their recipients that, if questioned by police or in court, they should say they could not remember anything. Savidan and Uele were specially instructed: "As for possible alib[i] we all kicked in the room getting

6

hi[gh] all night or most of the night." The letters to Diaz and Myers offered each of them $10,000, and the letters to Savidan and Uele used a series of dollar signs to indicate the offer of a large payment. The letters all stated that their author did not want to go to court for a murder he "didn't do." Each letter ended with "Now burn this letter."

Defendant also tried to influence other witnesses. Sandra Floyd testified that in 1999 she met defendant on a jail bus on the way to court. Defendant showed Floyd pictures of four women, and Floyd recognized Uele among these women. Floyd discussed the matter with a defense investigator and conceded that defendant was probably showing her the pictures because he was accusing them of being "snitches." She also warned Uele that she saw a picture of Uele "testifying against a gentleman." Later, a sheriff's deputy found the four photographs in a search of defendant's cell.

Thereafter, during defendant's trial, Heather Castaneda met defendant on a jail bus on the way to court. Defendant told her that he had been "snitched off" by Uele, who was on the same bus to the court with him and Castaneda, and he indicated that he wanted Uele to be killed. After Castaneda reported this conversation to sheriff's deputies, defendant threatened to arrange the murder of Castaneda's son, and he made similar threats against Castaneda.

### 2. Defense evidence

Defense investigators testified that Uele had once lived near the place where Kelly Gordon's burned body was found.

### B. Penalty Phase

#### 1. Prosecution evidence

Pamela Hack testified that in 1979 defendant tried to snatch her purse as she left a store. When Hack refused to let go of the purse, defendant dragged her

7

over the asphalt surface of the parking lot.  Defendant also slapped her.  Hack then let go of her purse, and defendant fled.  Hack suffered several injuries.

Bradford Miles testified that in 1984 he and defendant were both inmates at the Los Angeles County jail.  According to Miles, defendant and another inmate attacked Miles and stole his property.  Defendant forcibly sodomized Miles, forced Miles to masturbate him, and tried to force Miles to orally copulate him.  Miles testified that an investigator named "Mr. Vacca" interviewed him in his home about this incident, and he denied the incident because the interview took place in front of Miles's girlfriend and friend, who did not know about the incident.

In 1991, defendant asked Lisa Walker to work for him as a prostitute.  When she refused, defendant broke her jaw.  He also threatened Vanessa Taylor, who witnessed the assault on Walker, scaring her so much that she stabbed him.

Orange County Sheriff's Deputy Gene Hyatt testified that in October 1996, he was assigned to the Orange County men's jail where defendant and Gary Ahquin were inmates.  Deputy Hyatt saw defendant assault Ahquin with closed fists, although Ahquin had done nothing to provoke the attack.  Ahquin suffered a broken nose.  Ahquin told Hyatt that defendant thought Ahquin was a "snitch."

Sheriff's Deputy David Barr testified that in June 1999 he was assigned to the Orange County men's jail where defendant and Andrew Lesky were inmates.  Deputy Barr was preparing to put defendant into restraints, but defendant said his left wrist was fractured, so Barr left that wrist uncuffed.  Deputy Barr then told defendant to stand behind fellow inmate Lesky.  Deputy Barr saw defendant punch Lesky hard, in the back of the head, causing Lesky to fall.  Lesky hit his head on the ground, resulting in a cut that required seven stitches.  When Deputy Barr later testified about this incident in defendant's presence, defendant pointed his hand at Barr and simulated pulling the trigger of a gun.

8

The parties stipulated that defendant had suffered nine prior felony convictions. On November 19, 1979, defendant was convicted of attempted grand theft of an automobile. The same day, he was convicted of the robbery of Pamela Hack. On February 23, 1984, defendant was convicted of assault with a deadly weapon. On October 10, 1984, defendant was convicted of the robbery of Bradford Miles. On May 16, 1986, defendant was convicted of possession of heroin. On August 19, 1988, defendant was convicted of possession of cocaine for sale. On June 16, 1989, defendant was convicted of possession of a firearm by a person previously convicted of a felony. On August 30, 1991, defendant was convicted of possession of marijuana in jail. On October 19, 1992, defendant was convicted of possession of a firearm by a person previously convicted of a felony.

Murder victim Kelly Gordon's mother, stepfather, and brother all testified. Gordon's brother stated that he was "crushed inside" because of Gordon's murder and added that he would have given defendant the money that Gordon owed if defendant would have spared her life. Gordon's mother and stepfather said that they are raising Gordon's young son, Joey. Gordon's mother said that Gordon had been a good mother. Gordon's stepfather testified that her death had "taken away a piece of us."

### 2. *Defense evidence*

A defense investigator testified that he interviewed Bradford Miles at home on August 16, 1999. During the interview, which took place in front of Miles's friends, Miles denied that defendant had sodomized him when they were in jail in 1984. The interview was not recorded.

Several of defendant's family members testified that defendant was loving and respectful when he was a young boy. One of defendant's nephews said that defendant was a good uncle who urged him to do well in school and to play

9

football.  According to defendant's sister, her children love defendant and he "means everything to our family."  Defendant's brother testified that he loves defendant, although he added that he disapproved of the way defendant had led his life.

Defendant was one of five children born to his mother.  His father died in a car accident when defendant was six years old.[2]  Defendant's stepfather beat defendant and his siblings.  Defendant's brother testified that their mother worked hard to become a registered nurse and to support the family.  She was a good role model and tried to help defendant stay out of trouble, although she did give him beatings "with a switch."  She died in 1981.

## II. DISCUSSION

### A.  Sufficiency of Evidence to Support Kidnapping Special Circumstance

Defendant argues that the evidence is insufficient to support the jury's true finding regarding the kidnapping special circumstance.  He asserts that this error violated his constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, his analogous rights under the California Constitution, and his rights under state law.[3]

---

[2]      Defendant's sister testified to "hav[ing] heard" that defendant's biological father was a neighbor named "T. Sanster," which if true would mean that the man who died in the car accident was not actually defendant's father.

[3]      What we said in *People v. Loker* (2008) 44 Cal.4th 691, 704, footnote 7, applies here:  "[A]s to this, and almost every other appellate claim, defendant contends the alleged error infringed his constitutional rights.  In those instances where he did not present constitutional theories below, it appears that either (1) the appellate claim is one that required no objection to preserve it, or (2) the new arguments are based on factual or legal standards no different from those the trial court was asked to apply, but raise the additional legal consequence of violating the Constitution.  'To that extent, defendant's new constitutional arguments are not forfeited on appeal.'  (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17.)  No

*(footnote continued on next page)*

10

Section 190.2, subdivision (a) provides in relevant part: "The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found under Section 190.4 to be true: [¶] . . . [¶] (17) The murder was committed *while the defendant was engaged in*, or was an accomplice in, *the commission of*, attempted commission of, *or the immediate flight after committing*, or attempting to commit, *the following felonies*: [¶] . . . [¶] (B) *Kidnapping . . . .*" (Italics added.) At the time of defendant's offense, this special circumstance required an independent felonious purpose to commit one of the listed felonies (in this case, kidnapping).[4] In other words, the kidnapping could not be merely incidental to the murder, with the murder being the defendant's primary purpose. (*People v. Navarette* (2003) 30 Cal.4th 458; *People v. Green* (1980) 27 Cal.3d 1, 61-62.) We have, however, found sufficient evidence to support this special circumstance so long as there was a concurrent purpose to commit both the murder and one of the listed felonies.

---

*(footnote continued from previous page)*

separate constitutional discussion is required, or provided, when rejection of a claim on the merits necessarily leads to rejection of any constitutional theory or 'gloss' raised for the first time here."

[4] In 1998, the Legislature adopted section 190.2, subdivision (a)(17)(M), which became effective after voter approval (Prop. 18, Primary Elec. (Mar. 7, 2000)). This new subdivision eliminated the independent felonious purpose requirement for both the kidnapping and the arson special circumstances. It provides: "To prove the special circumstances of kidnapping in subparagraph (B), or arson in subparagraph (H), if there is specific intent to kill, it is only required that there be proof of the elements of those felonies. If so established, those two special circumstances are proven *even if the felony of kidnapping or arson is committed primarily or solely for the purpose of facilitating the murder.*" (Italics added.)

11

(*People v. Bolden* (2002) 29 Cal.4th 515, 554, 558; *People v. Raley* (1992) 2 Cal.4th 870, 903.)

Here, according to defendant, the evidence showed that his intent from the outset was to kill Kelly Gordon, and that the kidnapping was merely incidental to that killing. Defendant asserts that the record includes no evidence of an independent purpose to kidnap Gordon.

The evidence that related to the kidnapping charge and kidnapping special circumstance was the testimony that defendant placed Gordon in the trunk of the Cadillac while she was still alive, shut the trunk, asked for the keys to the car, and left. The same Cadillac was later found in a different location, burning, with Gordon's burned body in the trunk. Defendant points out, however, that before any of these events, he told Savidan of his intent to kill Gordon, he placed a bag over Gordon's head, he choked her from behind, and then, after putting Gordon in the trunk of the car, he told Uele and Myers: "We got to take her out . . . because she w[ill] tell." In defendant's view, all this evidence suggests that his primary intent was to kill Gordon, and that the kidnapping was undertaken merely in furtherance of the killing, not with an independent purpose. In the trial court, defendant twice moved for dismissal of the kidnapping special circumstance allegation, and the trial court denied the motion both times.

Defendant is wrong when he asserts that there was no evidence from which the jury could infer an independent felonious purpose to kidnap Gordon. The initial assault took place at night (after 7:00 p.m.), in a complex of automotive repair shops that were likely closed for the night, at the end of a long, narrow parking lot, behind a four-to-five-foot-high brick wall. Defendant could have killed Gordon right there, by choking her, clubbing her, or by using a knife from the motel (assuming he had no access to a firearm). Or, he could have obtained gasoline from a nearby gas station, returned to the same secluded location where

12

the assault took place, and done his horrible deed right there, in the dark parking lot, behind the brick wall. He then could easily have walked back to his motel room, which was right next door.

Instead of killing Gordon where he was, however, defendant chose to take her for a drive — and not just a few miles. He drove 16 miles, from Anaheim to an unincorporated area near Lakewood. It took a detective from the Los Angeles County Sheriff's Department about 25 minutes to drive the same distance in light traffic. Defendant had not mentioned to anyone an intent to burn Gordon alive, and her transgression would not seem to warrant so horrible a death. A reasonable jury therefore could infer that defendant was not sure what he wanted to do with Gordon when he drove away with her in the trunk. He wanted to think about it, and going for a drive was his way of thinking about it.

It is also possible that defendant's initial plan was to use the gasoline to destroy evidence of the assault, such as bloodstains in the interior of the Cadillac or in the trunk. He may have kidnapped Gordon with the purpose of obtaining the gasoline and then later decided to use the gasoline to kill Gordon.

Moreover, even if defendant intended from the beginning to kill Gordon and even if that was his *primary* purpose, that point is irrelevant to our analysis. The jury only needed to find that defendant also had another *concurrent* objective when he kidnapped Gordon. (See *People v. Bolden*, *supra*, 29 Cal.4th at p. 554, 558; *People v. Raley*, *supra*, 2 Cal.4th at p. 903.) If defendant intended to kill Gordon, but he wanted *first* to drive her around in a locked trunk, thoroughly terrifying her before she actually died, then the independent purpose requirement of *People v. Green*, *supra*, 27 Cal.3d at pages 59 to 62, is satisfied. (See *People v. Raley*, at p. 903 ["Concurrent intent to kill and to commit an independent felony will support a felony-murder special circumstance . . . ."].)

13

While lying bruised and bleeding in the dark trunk of a car that was being driven toward some unknown destination, Gordon must have been terrified, and defendant must have known that by driving her such a long distance, he was increasing her terror. If, independent of any other purpose he might have had, he took some satisfaction in the terror she was experiencing during the drive — that is, if the terror was at least *one* of his purposes — then he had the independent, concurrent purpose for the crime of kidnapping that our case law requires.

Defendant's actions during the assault on Gordon — which included placing a plastic bag over her head (a bag she could easily tear off) and choking her by putting his arm around her neck — were better calculated to instill fear than to kill. The jury therefore could reasonably infer that even if defendant's *ultimate* purpose was to kill Gordon, he also wanted to terrify her before she died.

Finally, our own view of what the evidence shows is irrelevant. The relevant inquiry is whether it would be irrational for a jury to conclude that defendant intended to kidnap Gordon for some reason (such as to instill fear) that was in addition to and independent of his intent to murder her. (*People v. Raley*, *supra*, 2 Cal.4th at p. 902.) Although the evidence of such a goal is far from overwhelming, it is sufficient to support the jury's verdict.

It is true that the jury *also* could have inferred defendant's version of the facts, but defendant is wrong to assert that his interpretation of the evidence is the only reasonable interpretation. Because, as discussed above, the record contains sufficient evidence to support the jury's finding of an independent purpose to kidnap Gordon, we need not set aside the kidnapping special circumstance finding on that ground. (See *People v. Raley*, *supra*, 2 Cal.4th at p. 903 [because the defendant put his victims in the trunk of his car and drove them to his home, he might not have formed the intent to kill until after the asportation]; see also *People v. Barnett* (1998) 17 Cal.4th 1044, 1158 [although some evidence showed that the

14

defendant threatened to kill the victim on the day of the murder, the jury could infer that the defendant had not finally decided the victim's fate at the time of the asportation].)

### B. Claims of Instructional Error Regarding Kidnapping Special Circumstance

Defendant argues that the jury was not properly instructed regarding the need to find an independent felonious purpose to kidnap Gordon, and therefore the kidnapping special circumstance finding should be set aside. We agree.

The trial court instructed the jury using CALJIC No. 8.81.17, and the court included this standard instruction's second paragraph because of evidence from which the jury could infer that defendant's only purpose was to kill Gordon and that he lacked an independent felonious purpose to kidnap her. (See *People v. Navarette*, *supra*, 30 Cal.4th at p. 505.) The standard instruction does not specifically mention kidnapping, but it has several blank spaces, with a use note providing: "This instruction is designed to be adapted to any one or more of the . . . crimes in Penal Code, § 190.2(a)(17) by inserting in the blank spaces the names of the crime." (Use Note to CALJIC No. 8.81.17 (5th ed. 1988), p. 396.)

Here, the trial court properly inserted "kidnapping" as the relevant crime in most places in the instruction at issue, but in the first blank space of paragraph No. 2 the court inserted not "kidnapping" but "assault by force likely to produce great bodily injury."[5] For reasons that are not clear, the trial court insisted on

---

[5] The full instruction as given by the court stated: "To find that the special circumstance, referred to in these instructions as murder in the commission of <u>kidnapping</u>, is true, it must be proved:

1. The murder was committed while the defendant was engaged in the commission of a <u>kidnapping</u>; and

2. [A] The murder was committed in order to carry out or advance the commission of the crime of <u>assault by force likely to produce great bodily injury</u>

*(footnote continued on next page)*

15

deviating from the instruction's use note in this way, and neither the defense nor the prosecution objected.**6**  The effect of this alteration was to tell the jury that it could find the kidnapping special-circumstance allegation true only if it found that defendant committed the *murder* "to carry out or advance the commission of the crime of assault by force . . . or to facilitate the escape therefrom or to avoid detection."

During deliberations, the jury asked:  "(1) Does the phrase 'facilitate escape therefrom' refer to the crime of assault by force, or the crime of kidnapping, or something other than that?  [¶]  (2) Does the phrase 'avoid detection' refer to the crime of assault by force, or the crime of kidnapping, or something other than that?"  The court sent the jury's note back to the jury with this answer written on the bottom:  "1 & 2 both refer to the crime of assault by force."

The trial court erred in altering CALJIC No. 8.81.17 to require a finding that the *murder* was committed "to carry out or advance the commission of" the *assault* on Gordon "or to facilitate the escape therefrom or to avoid detection." Under our holding in *People v. Green*, *supra*, 27 Cal.3d at pages 61 to 62, the prosecution here had to prove (for purposes of establishing the kidnapping special circumstance) that defendant *kidnapped* Gordon for an independent felonious

---

*(footnote continued from previous page)*

or to facilitate the escape therefrom or to avoid detection.  [B] In other words, the special circumstance referred to in these instructions is not established if the kidnapping was merely incidental to the commission of the murder." (Underlining and bracketed capital letters added.)

**6**      Although defendant did not object at trial, the alleged instructional error affected an element of the kidnapping special circumstance, and therefore we will consider the merits of the issue.  (See *People v. Prieto* (2003) 30 Cal.4th 226, 247; see also § 1259.)

purpose and therefore that the *kidnapping* was not merely incidental to the murder. Under *Green*, however, the jury did not need to find that the *murder* was motivated in some way by defendant's initial *assault* on Gordon.

Accordingly, we agree with defendant that the trial court erred in its alteration of the instruction regarding the kidnapping special circumstance. We also agree that the error was prejudicial. An instructional error regarding an element of a special circumstance requires reversal unless the error was harmless beyond a reasonable doubt. (*People v. Bolden*, *supra*, 29 Cal.4th at p. 560.) In this case, as explained below, we cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error. Therefore, we must set aside the true finding on the kidnapping special-circumstance allegation.

As given by the trial court, paragraph No. 2 of the instruction provided: "[A] The murder was committed in order to carry out or advance the commission of the crime of assault by force likely to produce great bodily injury or to facilitate the escape therefrom or to avoid detection. [B] *In other words*, the special circumstance referred to in these instructions is not established if the kidnapping was merely incidental to the commission of the murder." (Italics and bracketed capital letters added.) The instruction is supposed to refer to the same target crime throughout (here, kidnapping). When it does so, sentence [B] of the instruction's second paragraph merely elaborates or clarifies the idea expressed in sentence [A] of the paragraph, and sentence [A] (which is only illustrative) is not even necessary to the instruction. (See *People v. Dement* (2011) 53 Cal.4th 1, 95, fn. 25.) For this reason, sentence [B] of the instruction's second paragraph begins with the phrase "In other words." But here the trial court erroneously inserted one target offense (assault by force) in sentence [A], and a *different* target offense (kidnapping) in sentence [B]. Because each sentence discussed a different target offense, sentence [B] did not elaborate upon or clarify the idea discussed in

17

sentence [A], so the phrase "In other words" at the beginning of sentence [B] was likely to have confused the jury.

The phrase "In other words" is often understood as the verbal equivalent of an "equals" sign in mathematics; what comes before the phrase is substantively the same as what comes after the phrase. Therefore, if the jury here was confused about the meaning of sentence [B] of the instruction's second paragraph, it may have decided simply to ignore that sentence, concluding from the introductory phrase ("In other words") that the sentence merely restated the idea expressed in sentence [A] of the same paragraph (which the trial court had erroneously modified). Significantly, the jury's question to the trial court indicates that sentence [A] was the primary focus of the jury's attention, and the court's response to the jury compounded the court's previous error by wrongly telling the jury that sentence [A] was correct as written. The jury's question suggests that it may have found the requirements of the special circumstance satisfied by finding that defendant committed the murder to facilitate his escape from the assault or to avoid detection of that crime.

In sum, we cannot conclude beyond a reasonable doubt that the jury gave proper weight to sentence [B] of the instruction's paragraph No. 2. Because the sentence began with the phrase "In other words" but expressed a new idea, entirely distinct from the idea expressed in sentence [A] of the same paragraph (which the court had erroneously modified), we cannot know beyond a reasonable doubt that the jury read sentence [B], understood it, and applied it.

Sentence [B], however, is critical to paragraph No. 2 of the instruction in a case like this one, in which the evidence could support an inference that defendant's only purpose was to kill and that he lacked an independent purpose to kidnap. (See *People v. Navarette*, *supra*, 30 Cal.4th at p. 505.) Indeed, the evidence here of an independent purpose to kidnap was weak — although for the

18

reasons previously stated (see pt. II.A., *ante*), it was minimally sufficient. Given the weakness of that evidence, sentence [B] — which told the jury of the need to find that the kidnapping was not merely incidental to the murder — was of particular importance here. That critical idea was not presented to the jury in any other sentence of the instruction. Instead, sentence [A] of the same paragraph (which the trial court had erroneously modified) inaccurately suggested to the jury that the only thing the prosecution needed to prove (for purposes of satisfying paragraph No. 2 of the instruction) was that the murder was motivated in some way by defendant's initial assault on Gordon, a matter that was very easily proved on this record. Hence, we cannot be sure that the jury ever found that the kidnapping was not merely incidental to the murder, as is required by *People v. Green*, *supra*, 27 Cal.3d at pages 61 to 62.

Therefore, we must set aside the jury's true finding with respect to the kidnapping special circumstance. Because the jury failed to reach a verdict on the torture special circumstance, we must also reverse the judgment of death. We will nevertheless address defendant's additional arguments to the extent they challenge the validity of his first degree murder, kidnapping, and assault convictions.

### C. Excusal of Four Prospective Jurors for Cause Based on Their Views Regarding the Death Penalty

Defendant faults the trial court for dismissing four prospective jurors based on their inability to follow California law with respect to the death penalty. (See *Wainwright v. Witt* (1985) 469 U.S. 412, 424; *People v. Gray* (2005) 37 Cal.4th 168, 192-193.) Because we are reversing the judgment of death, we need not address this argument.

### D. Admission of Uele's Hearsay Statements

Defendant faults the trial court for admitting the hearsay statements Anna Sara Uele made to Misty Sinks on the night of Gordon's murder.

19

Uele testified for the prosecution regarding the assault on Gordon.  She described her participation in the assault, but denied that she was an accomplice to the murder.  Uele admitted, however, that she had opened the trunk of the Cadillac when defendant asked her to do so, after which defendant put Gordon in the trunk and shut it, without Uele's help.  Defendant's counsel cross-examined Uele regarding her version of the assault on Gordon, and Uele admitted that at the preliminary hearing she had denied opening the trunk.  Uele also acknowledged other minor inconsistencies between her testimony at trial and her prior statements.[7]  In addition, Uele's testimony differed from that of the other women on a couple of minor points.[8]

In an effort to corroborate Uele's testimony, the prosecution asked to present the testimony of Misty Sinks, who had talked to Uele on the night of Gordon's murder and who could testify to what Uele had said to her.  Defendant objected on hearsay grounds, but the trial court allowed the testimony as a prior consistent statement admissible under Evidence Code section 791.  Sinks then testified that on a night in 1995 she got home between 10:00 p.m. and midnight, and Uele and another woman were waiting there.  Uele had blood on her shorts and top.  Uele told Sinks that she and some others "had beat up a girl" "over a debt," and that defendant had "put the girl in the trunk."  This testimony was

---

[7]  Those inconsistencies were (1) whether or not Savidan had blood on her after the assault; (2) whether a pager that the women were using belonged to Myers or to someone else; and (3) whether Uele went to defendant's motel room to get drugs or for some other reason.

[8]  Those differences were (1) whether Gordon was hit before or after being dragged out of the Cadillac; and (2) whether Diaz was already in defendant's motel room when Uele arrived with Myers and Jasmine.

apparently significant to the jury, because the jury asked to hear it again during its deliberations.

On this appeal, defendant argues that the trial court erred by admitting Uele's statement to Sinks under Evidence Code section 791. That statute's subdivision (b), in combination with Evidence Code section 1236, makes evidence of a witness's prior consistent statement admissible if it is offered after an "implied charge has been made that [the witness's] testimony at the hearing is recently fabricated . . . and the statement was made before the . . . motive for fabrication . . . is alleged to have arisen." (Evid. Code, § 791, subd. (b).)[9] Defendant concedes that his trial counsel's cross-examination of Uele amounted to an "implied charge" that her testimony had been "recently fabricated" (Evid. Code, § 791, subd. (b)), but he argues that Uele's statement to Sinks was not "made before the . . . motive for fabrication" was "alleged to have arisen" (*ibid.*) and therefore did not meet the temporal requirement of Evidence Code section 791. Defendant argues that Uele's motive to fabricate arose at the time of defendant's assault on Gordon or immediately thereafter. Therefore, according to

---

**9**     Evidence Code section 1236 provides in full: "Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement is consistent with his testimony at the hearing and is offered in compliance with Section 791." Evidence Code section 791 provides in full: "Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after: [¶] (a) Evidence of a statement made by him that is inconsistent with any part of his testimony at the hearing has been admitted for the purpose of attacking his credibility, and the statement was made before the alleged inconsistent statement; or [¶] (b) An express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen."

defendant, Uele had the same motive to fabricate when making her statement to Sinks as she had when later testifying at trial.

Uele's testimony at trial was broadly impeached when defense counsel brought out on cross-examination inconsistencies between her testimony and her prior statements and also between her testimony and the testimony of the other women. Defense counsel's implied charge was that Uele's entire testimony was unreliable, not just that Uele had fabricated some specific point, and this broad charge of fabrication warranted admission of a prior consistent statement for purposes of rehabilitating the witness. In *People v. Kennedy* (2005) 36 Cal.4th 595, 614, for example, we said that "Evidence Code section 791 permits the admission of a prior consistent statement when there is a charge that the testimony given is fabricated or biased, not just when a particular statement at trial is challenged."

On this appeal, defendant renews the argument that Uele's motive for fabrication arose at the time of her participation in the assault on Gordon, and therefore Uele's statement to Sinks was not made *before* the motive for fabrication arose. But defense counsel's implied charge of fabrication was largely based on inconsistencies between Uele's trial testimony and her testimony at the preliminary hearing, and therefore the implied charge of fabrication must contemplate some motive to fabricate that arose *after the preliminary hearing*. We do not know what, if any, motive to fabricate arose after the preliminary hearing, but assuming one did, Uele's statement to Sinks was made *before* the preliminary hearing, and therefore the temporal requirement of Evidence Code section 791, subdivision (b) was satisfied.

22

**E. Admission into Evidence of Photograph of Gordon's Burned Body**

In a motion in limine before the guilt phase, the defense sought to exclude photographs showing Gordon's burned body lying in the trunk of the Cadillac. The prosecution argued that the photographs were relevant to show torture, premeditation, deliberation, and identity. In opposition, the defense contended that the admission of multiple photographs would be cumulative. Although the defense ultimately reaffirmed its request for exclusion of all the photographs in question, it also conceded that the trial court could properly admit one of the photographs into evidence.

The trial court examined four photographs and selected a photograph that showed Gordon's burned body from a slight distance, ruling that the photo was admissible to show premeditation, deliberation, malice aforethought, and specific intent. The prosecutor used the photograph at closing argument in support of the torture special circumstance, and defendant did not object at that time.

"When conditions depicted in photographic evidence are relevant to the prosecution's case, it is 'not obliged to prove these details solely from the testimony of live witnesses, and the jury was entitled to see how the physical details of the scene and body supported the prosecution theory' of the crimes. (*People v. Turner* (1990) 50 Cal.3d 668, 706; see also *People v. Sheid* (1997) 16 Cal.4th 1, 13-18.) '[T]he decision to admit victim photographs is a discretionary matter we will not disturb on appeal unless the prejudicial effect of the photographs clearly outweighs their probative value.' (*People v. Taylor* (2001) 26 Cal.4th 1155, 1168.)" (*People v. Davis* (2009) 46 Cal.4th 539, 615.)

Here, the photograph of Gordon's dead body depicted the full extent of her burns and supported the prosecution's assertion that she was doused with gasoline and then set on fire. Considered in combination with the autopsy evidence showing that Gordon was alive when she was set on fire, the photograph was

23

probative of both premeditation and torture.  The trial court selected a single photograph that showed the body from a slight distance, explicitly rejecting a photograph that showed a close-up view of the burned face.  We find no abuse of discretion.

### F.  Motion to Impanel a New Jury

After the jury returned its verdict as to guilt, it sent a confidential note to the trial court, expressing concern that defendant had threatened witnesses and asking whether defendant had access to personal information about the jurors. The trial court reassured the jury that defendant knew them only by number. Defendant then unsuccessfully moved to impanel a new jury based on an asserted inability of the existing jury to decide the penalty impartially.  Defendant argues on appeal that the trial court erred.  Because we are reversing the judgment of death, we need not address this argument.

### G.  Alleged Section 654 Violation

Section 654's subdivision (a) provides in relevant part:  "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  Defendant argues that the trial court violated that provision's prohibition against multiple sentences for a single act or course of conduct, by imposing a death sentence for the murder conviction and a consecutive 25-years-to-life term for the felony assault conviction.

According to defendant, he formed the intent to kill Gordon *before* he ever assaulted her, and therefore any assaultive behavior that could possibly support his felony assault conviction (§ 245, subd. (a)(1) [assault by means of force likely to produce great bodily injury]) was done in an effort to kill Gordon.  As such —

24

defendant asserts — his murder and felony assault convictions were necessarily based on the same indivisible course of conduct, and under section 654, he can only be sentenced for one of the two. (See *People v. Hicks* (1993) 6 Cal.4th 784, 789.) Although defendant did not make this argument in the trial court, we will consider it on the merits. (See *People v. Scott* (1994) 9 Cal.4th 331, 354, fn. 17 [§ 654 error results in an " 'unauthorized' sentence" and hence is reviewable on appeal even if not raised in the trial court].)

A trial court's express or implied determination that two crimes were separate, involving separate objectives, must be upheld on appeal if supported by substantial evidence. (*People v. Oban* (1996) 13 Cal.4th 622, 730-731.) Here, in sentencing defendant for both the murder and the assault, the trial court expressly concluded that the murder of Gordon was separate from defendant's earlier assault on her. The court said: "Count III, which is assault by force likely to produce great bodily injury, *that actually is a separate incident. It was before the kidnapping and before the homicide.*" (Italics added.) Substantial evidence supports that conclusion.

As we pointed out earlier when addressing defendant's argument that the evidence was insufficient to support the kidnapping special circumstance (pt. II.A., *ante*), defendant might not have finalized his intent to kill Gordon at the time of the assault. Notwithstanding his boastful statements to Uele and Myers, if he had truly intended to kill Gordon from the first moment he assaulted her, he could have done so without first driving her 16 miles. Here, there was enough evidence from which the trial court could conclude, as it did, that defendant arrived at his final decision to kill Gordon after the assault. Accordingly, we find no error.

### H. Constitutionality of California's Death Penalty Law and Violation of International Law

Defendant raises numerous constitutional challenges to California's death penalty law, and he also asserts that his conviction and sentence violate international law. Because we are reversing the judgment of death, we need not address these arguments.

### I. Trial Court's Asserted Errors, Considered Cumulatively

Defendant contends that the trial court's multiple errors, considered together, denied him due process and a fair trial. We have identified only a single error (the trial court's erroneous instruction to the jury regarding the need to find an independent purpose to support the kidnapping special circumstance), and we have determined based on this error to reverse the judgment of death. (See pt. II.B., *ante*.) Because the trial court did not make multiple errors, defendant's claim of cumulative prejudice necessarily fails.

### III. DISPOSITION

The judgment is reversed as to the sentence of death, and the jury's true finding on the kidnapping special circumstance allegation is stricken. The case is remanded to the trial court for further proceedings consistent with our opinion.

KENNARD, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
BAXTER, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

26

**CONCURRING OPINION BY LIU, J.**


In reviewing the jury's finding of the kidnap-murder special circumstance, our role is to "examine the evidence in the light most favorable to the prosecution and decide whether a rational trier of fact could find beyond a reasonable doubt that defendant had a purpose for the kidnapping apart from murder." (*People v. Raley* (1992) 2 Cal.4th 870, 902.) Applying that deferential standard, the court concludes that the evidence that defendant had an independent purpose for kidnapping Kelly Gordon was "minimally sufficient." (Maj. opn., *ante*, at p. 19.) At the same time, the court candidly notes that the evidence was "weak" and "far from overwhelming." (*Id.* at pp. 14, 19.) I offer one additional observation. Although we typically apply sufficiency-of-the-evidence review to a jury *verdict*, it is not clear that the jury in this case *actually found* an independent purpose for the kidnapping because, as our opinion explains (maj. opn., *ante*, at pp. 15-19), it was never properly instructed to do so. In light of the instructional error, our conclusion that a rational jury could have returned a true finding on the special circumstance does not mean that the jury in this case actually believed such a finding was supported by the evidence beyond a reasonable doubt.

LIU, J.


I CONCUR:  CORRIGAN, J.


1

**CONCURRING & DISSENTING OPINION BY WERDEGAR, J.**


I agree with the majority that the jury's true finding on the kidnapping special circumstance must be set aside and the judgment of death reversed. I disagree that the evidence supporting the special circumstance was sufficient to permit a retrial of the allegation that defendant committed the murder while engaged in the commission of a kidnapping.

As the majority acknowledges and the concurring opinion underscores, the evidence that defendant had a purpose for the kidnapping *independent of his intent to murder the victim*, as required by law at the time of his offense (*People v. Navarette* (2003) 30 Cal.4th 458, 505; *People v. Green* (1980) 27 Cal.3d 1, 61-62), was "weak" and "far from overwhelming." (Maj. opn., *ante*, at pp. 14, 18; conc. opn. of Liu, J., *ante.*) I would add that it was, as well, entirely speculative.

Defendant's intent to kill Kelly Gordon was clear from the beginning. He expressed his intent to Michelle Savidan in the parking lot, stating Gordon "is a snitch. I want to put her out." When he got into the Cadillac with Gordon and the other women, he put a plastic bag over Gordon's head and tightened it. When Gordon was able to tear the bag off, defendant put his arm around her neck, choking her. He then told the driver of the Cadillac to open the trunk, whereupon he pulled Gordon out of the car, forced her into the trunk, hit her and choked her, and shut the lid. When the other women protested, defendant replied that Gordon was "going to tell" on them and they "got to take her out." Defendant took the

1

keys to the Cadillac and drove away with Gordon in the trunk. The car was later found 16 miles away, burning, with Gordon's burned body in the trunk.

The majority finds the foregoing evidence, although weak, "minimally sufficient" (maj. opn., *ante*, at p. 19) to permit a jury to find beyond a reasonable doubt that defendant had a purpose independent of Gordon's murder for transporting her away from the motel parking lot. In support, the majority speculates that because defendant could have killed Gordon right there, in the parking lot, and could have obtained gasoline from a supposed nearby gas station if he wished to burn the car, a jury could infer he kidnapped the victim because he was not sure what he wanted to do with her and wanted to think about it, "and going for a drive was his way of thinking about it." (*Id.* at p. 13.) Or he may have wanted first to drive her around in a locked trunk, so as to terrify her before she actually died. (*Ibid.*) Or "[h]e may have kidnapped Gordon with the purpose of obtaining the gasoline and then *later* decided to use the gasoline to kill Gordon." (*Ibid.*, italics added.)

I disagree. No evidence of any of the foregoing speculative purposes for the kidnapping was presented to the jury. Nor did the prosecutor argue any such independent purposes. In my view, the evidence, as opposed to speculation and conjecture, admits only the conclusion that defendant transported the victim to another location simply to kill her, viz., the kidnapping was in furtherance of the killing. To uphold the sufficiency of the evidence to support the special circumstance finding in this case is to stretch the principle of deferential review of a jury verdict to the point of meaninglessness.

Consequently, insofar as the majority finds the evidence sufficient to support the special circumstance, I dissent.

**WERDEGAR, J.**

2

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Brents

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S093754
**Date Filed:** February 2, 2012

_____

**Court:** Superior
**County:** Orange
**Judge:** John J. Ryan

_____

**Counsel:**

Michael B. McPartland, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Adrianne S. Denault, Kyle Niki Shaffer and Robin Derman, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Michael B. McPartland
P.O. Box 13442
Palm Desert, CA  92255
(760) 772-8265

Robin Derman
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-2230