Filed 2/2/26  P. v. Soto CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

<table>
<tr><td>THE PEOPLE,<br><br> Plaintiff and Respondent,<br><br>v.<br><br>ERICK SOTO,<br><br> Defendant and Appellant.</td><td>E085325<br><br>(Super.Ct.No. FVI24001589)<br><br>OPINION</td></tr>
</table>

APPEAL from the Superior Court of San Bernardino County.  Albert Hsueh, Judge.  Affirmed.

Gerald J. Miller, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Joshua Trinh, Deputy Attorneys General, for Plaintiff and Respondent.

I.

INTRODUCTION

A jury found defendant and appellant Erick Soto guilty of assault with a deadly weapon (Pen. Code[1] § 245, subd. (a)(1); count 1) and criminal threats (§ 422, subd. (a); count 2). The jury also found true that defendant used a deadly and dangerous weapon (§ 12022, subd. (b)(1)) in the commission of count 2. The court sentenced defendant to a total term of three years, eight months in state prison as follows: the middle term of three years for count 1 and one-third of the middle term, or eight months, for count 2. The court struck punishment for the weapon use enhancement. On appeal, defendant contends the trial court erred by failing to stay his sentence on the criminal threats count because the threats were indivisible from the assault. We disagree and affirm the judgment.

II.

FACTUAL AND PROCEDURAL BACKGROUND

*A. Factual Background*

In 2024, defendant and S.G. worked out consistently at the 24 Hour Fitness gym in Apple Valley. Defendant and S.G. did not know each other but S.G. had seen him at the gym before and had a prior interaction with him. Around April or May 2024, S.G. was jumping rope when defendant threw an object at S.G.'s head. S.G. asked defendant what his problem was, and defendant replied, "well whatever you want." S.G. told defendant,

---

[1] All future statutory references are to the Penal Code unless otherwise stated.

2

"well if you want we can settle this right now." Defendant then left the area and recorded S.G. on his cell phone. Defendant continued to stare at S.G. as defendant was walking around the gym, but S.G. ignored him and eventually went home.

On another day, after the jump rope incident, defendant walked closely by S.G. in the locker room and made snide remarks at S.G.

On June 1, 2024, defendant, S.G., M.F., and two other gym members were inside of the sauna.[2] Defendant called S.G. a "bitch" and a "fucking farmer." Defendant also said he was "born in the city and that he was gangster." Looking at S.G., defendant further stated "that the paisas . . . they're gonna die and . . . the Ne***es are gonna die last." S.G. noted "a paisa is a country man, a fellow country man [from] Mexico."

S.G. eventually stood up, confronted defendant and asked defendant what his problem was. Defendant and S.G. then began to circle each other with their fists up and goaded the other to throw the first punch. After about 30 seconds, defendant said "fuck this," exited the sauna, and grabbed a fillet knife out of his bag. After retrieving the knife in his bag, defendant went inside the sauna, pointed the knife at S.G. and aggressively lunged at him. Defendant lunged and stabbed towards S.G. about 15 times. S.G. jumped out of the way to avoid being stabbed. While he made the stabbing motions, defendant told S.G. he was going to kill him and that S.G. "wasn't gonna leave there alive."

M.F. and the other two gym members exited the sauna. As one of the gym members left the sauna, defendant pointed the knife at his face and asked if he "want[ed]

---

[2] The gym's video surveillance was played for the jury at the time of defendant's trial.

3

some too." The gym member put his hands in the air and told defendant he was "just tryin' to exit the sauna." Defendant let him pass.

Using his water container to shield himself against the attack, S.G. stood on the bench and asked defendant why he had a knife and if he was afraid. M.F. testified that he heard defendant continue to make threats at S.G. inside the sauna while M.F. and the others were outside.

Defendant exited the sauna and a swimmer in the pool told defendant to leave because the "cops are already called." Defendant told the swimmer, "if anybody calls the cops [I'm] gonna fuckin' kill them."

Defendant returned to the sauna, telling S.G. to go "outside into the street" because he wanted to kill S.G. Defendant also told S.G. "that he'd be looking for [S.G.] on the street" and was "gonna kill [S.G.] and [his] entire family." S.G. remained in the sauna, concerned that defendant would return. During the altercation, S.G. believed he was going to die.

M.F. followed defendant as he exited the gym with his backpack. Returning to the gym, M.F. asked the front desk if anybody called 911 and called the police himself. S.G. spoke to the police and did not want to press charges because S.G. believed defendant was "gonna be out on the street looking for" him.

At some point before police arrived, defendant returned to the gym. Sheriff's deputies arrived about 40 minutes after M.F. called 911 and located defendant in the

4

bathroom.  After arresting defendant, the deputies searched his backpack and the gym but could not locate the knife.  The deputies found a screwdriver in defendant's backpack.

Defendant testified on his own behalf.  On the day of the jump rope incident, defendant waited a minute for S.G. to finish jumping rope so defendant could grab equipment.  The jump rope smacked defendant's hand when he tried to go around S.G.  Defendant also stated that he did not take the jump rope and hit S.G. or throw anything at S.G.

As the June 1, 2024 incident in the sauna, defendant and S.G. only spoke in English.  Defendant claimed that S.G. instigated the fight when he stared at defendant and called him names.  He denied ever having a knife, attempting to stab S.G., and threatening S.G.

B.  *Procedural Background*

During discussions concerning jury instructions, the prosecutor initially asked for instructions on unanimity for count 1 (assault with a deadly weapon) but later informed the court the People were not requesting the instruction.  Defense counsel then requested the instruction, stating, "it does apply as . . . the jury is looking at different incidents based on the testimony . . . . So I think the jury would have to find that it was the same act for the unanimity and not separate acts."  The prosecutor replied, "this is all part of the same course of conduct. . . . This is all basically part of the same interaction here at the gym.  So I don't think the unanimity instruction should be given because you don't have separate acts.  I believe that's contemplated by [CALCRIM No.] 3500."

5

The court noted that it had a "sua sponte duty to give this instruction if the prosecution presents evidence of multiple acts to prove a single count." The court further stated, "[a]nd for Count 1, the assault with a deadly weapon, there are seemingly multiple acts in terms of what's alleged here." After further discussion, the court determined that for count 1, no unanimity instruction was required because the offense "constitutes a continuous course of conduct." Defense counsel did not request an unanimity instruction for count 2 and the parties did not address unanimity for the criminal threats count.

During closing argument, as to the criminal threats count, the prosecutor stated: "There's six total elements there. First element, willfully threatened to kill or cause great bodily injury. What is the evidence we have? We have testimony from [S.G.] that the defendant threatened to kill him multiple times. What else do we have? Testimony from Mr. F[.] that he heard the defendant threaten to kill [S.G.], said he heard it in English. That element's been met. [¶] Defendant orally made the threat. This really isn't disputed between the two witnesses. [S.G.], Mr. F[.] tell you that threat was made orally. It wasn't a note that was passed or something like that. It was an oral threat. [¶] . . . [¶] We have testimony from [S.G.] that while making the threats, the defendant was armed with a fillet knife, and he was slashing and stabbing at him. That's nearly identical testimony to Mr. F[.], the defendant was armed with a knife. Clearly someone armed with a knife telling somebody that they're going to kill them intends their threat—or intends that their words be understood as a threat. That element's been met. [¶] . . . [¶]

6

We have the testimony from [S.G.]  We have the testimony from Mr. F[.] of the threats being made and the stabs and the slashes at the same time."

As to the deadly weapon enhancement allegation, the prosecutor argued:  "So what is the evidence?  The blade of the fillet knife was pointed at [S.G.] and [defendant] told him he was going to kill him.  What else?  The fillet knife was slashed and stabbed at [S.G.'s] exposed abdomen.  It's clearly meeting 'holding it in a menacing manner.'  It's not even a requirement there that it actually be used to hit him, just held in a menacing manner.  That's been met."

On October 21, 2024, a jury found defendant guilty of assault with a deadly weapon (§ 245, subd. (a)(1); count 1) and criminal threats (§ 422, subd. (a); count 2).  The jury also found true that defendant used a deadly and dangerous weapon (§ 12022, subd. (b)(1)) as to count 2.  In a bifurcated proceeding, the trial court found five of the 18 alleged aggravating circumstances to be true.

The sentencing hearing was held on December 6, 2024.  During that time, defense counsel argued that under section 654, the criminal threats, assault with a deadly weapon, and the knife use enhancement were "all one course of conduct."  Defense counsel explained, "[p]arsing this out, I think, would be a disservice as it was one continuous kind of heated exchange that was going on.  [¶]  And also to impose the weapon use for the criminal threat appear to be a double punishment as [defendant] would be already being punished for a 245(a)(1) which obviously would have to include a weapon."

The prosecutor responded, "both of those can stand independently of one another. So just because you can have assault with a deadly weapon without the 422 with the knife, conversely, you can have the 422 . . . with a knife but not used." The prosecutor added, "the manner in which it's used is not the same as what would be required under 245(a)(1). For the 245(a)(1), . . . it's required that it's likely to cause great bodily injury or death. For the purposes of . . . the 12022(b)(1), the requirement I believe is only that it's held in basically—effectively a threatening manner."

Defense counsel replied that the assault conviction under section 245, subdivision (a)(1) precluded imposition of the enhancement because he was being punished "doubly" for use of the knife.

The court refused to stay the punishment on count 2 for the criminal threat conviction. The court explained: "Looking at the 654 issue, the Court—I reviewed my notes for the testimony, specifically [S.G.], certainly for the Penal Code 245(a)(1) there is sufficient conduct including the stabbing or attempted stabbing coming within inches of [S.G.] that would qualify for the assault with a deadly weapon. [¶] As to the criminal threats, there were several different items or pieces of testimony that were helpful for this analysis. [S.G.] stated that Defendant made a threat before the point of pulling out the knife saying, I remember the defendant said that he was a gangster, that he was going to kill [S.G.], and that [S.G.] would know who he is. [¶] And then later in the action while holding the knife, he also made a threat of Defendant was going to kill [S.G.] and [S.G.] was not going to be alive. And continued making threats while pushing or stabbing the

8

knife forward.  [¶]  But also what's key is that after the initial incident in the sauna was over, in that moment, [S.G.] described that [defendant] circled around, walked out the door of the sauna, and then circled around and came back a second time, stood at the front of the door, and opened the door, and told [S.G.] to go outside to the street because he was going to kill [S.G.] without holding the knife in hand at that point, and basically making statements that he would kill [S.G.] and his family, making gestures to go outside and pointing outside.  And that particular portion of the gesturing and pointing is also on camera.  [¶]  So it seems that the threats, there are threats made at various times before pulling out the knife, while actually wielding the knife and stabbing the knife forward, and also after the conduct with the knife, and standing at the door, not holding the knife but still gesturing, go outside, making statements.  So there are threats at various levels which would seem to break up the continuous course of this action and also show that there was criminal threats with knife in hand and without knife in hand."

The court thereafter sentenced defendant to an aggregate term of three years, eight months in state prison with 377 days credit for time served as follows:  the middle term of three years for count 1 (assault with a deadly weapon) and one-third of the middle term, or eight months, for count 2 (criminal threat).  The court struck punishment for the knife use enhancement.  Defendant timely appealed.

9

III.

DISCUSSION

Relying on the colloquy concerning jury instructions, defendant contends the trial court should have stayed the sentence on the criminal threat conviction pursuant to section 654 because the assault and threat arose out of an indivisible course of conduct with a single intent and objective—to physically harm S.G. We are not persuaded.

"Section 654 precludes multiple punishments for a single act or indivisible course of conduct. [Citation.]" (*People v. Hester* (2000) 22 Cal.4th 290, 294.) " ' " 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may [not] be punished . . . for more than one.' " ' [Citation.]" (*People v. Jackson* (2016) 1 Cal.5th 269, 354.) "If, on the other hand, defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' [Citation.]" (*People v. Harrison* (1989) 48 Cal.3d 321, 335.) "The temporal proximity of two offenses is insufficient by itself to establish that they were incidental to a single objective. [Citation.] Objectives may be separate when 'the objectives were either (1) consecutive even if similar or (2) different even if simultaneous.' [Citations.]" (*People v. Vasquez* (2020) 44 Cal.App.5th 732, 737.)

10

Whether section 654 applies " 'is a question of fact for the trial court, which is vested with broad latitude in making its determination.' " (*People v. Vang* (2010) 184 Cal.App.4th 912, 915-916 (*Vang*), criticized on another point as stated in *People v. Washington* (2021) 61 Cal.App.5th 776, 799.)  When a " 'court sentences a defendant to separate terms without making an express finding the defendant entertained separate objectives, [it] is deemed to have made an implied finding each offense had a separate objective.' " (*In re L.J.* (2021) 72 Cal.App.5th 37, 43.)

" 'A trial court's express or implied determination that two crimes were separate, involving separate objectives, must be upheld on appeal if supported by substantial evidence.' " (*In re Raymundo M.* (2020) 52 Cal.App.5th 78, 94 (*Raymundo M.*); accord, *People v. McKinzie* (2012) 54 Cal.4th 1302, 1368, disapproved on other grounds in *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3.)  "Section 654 turns on the defendant's objective in violating both provisions, not the Legislature's purpose in enacting them, but examining the overall purpose behind the [provisions] helps illuminate the defendant's objective in violating them." (*People v. Britt* (2004) 32 Cal.4th 944, 952.)  We review the court's " 'determination in the light most favorable to the respondent and presume the existence of every fact the . . . court could reasonably deduce from the evidence.' " (*Vang*, *supra*, 184 Cal.App.4th at p. 916.)

"An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.)  "For purposes of assault with a deadly weapon under section 245(a)(1), 'a "deadly weapon" is "any object, instrument, or

weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury." [Citation.]' " (*Raymundo M.*, *supra*, 52 Cal.App.5th at p. 85.) To be convicted of assault with a deadly weapon a defendant must have done something with a deadly weapon that by its nature would directly and probably result in the application of force while having the present ability to apply force. (§ 245, subd. (a)(1); see CALCRIM No. 875.) To be convicted of a criminal threat requires the defendant "threaten[ ] to unlawfully kill or unlawfully cause great bodily injury." (CALCRIM No. 1300.)

We conclude substantial evidence supports the trial court's express finding defendant harbored different intents and objectives in assaulting, and criminally threatening, S.G. (See *People v. Brents* (2012) 53 Cal.4th 599, 618 (*Brents*) ["A trial court's express or implied determination that two crimes were separate, involving separate objectives, must be upheld on appeal if supported by substantial evidence."].)

*Raymundo M.*, *supra*, 52 Cal.App.5th 78 is directly on point. There, the court held that the trial court "could reasonably have found that [the juvenile] committed the assault with the objective of inflicting *physical* harm on [the victim], whereas [the juvenile] criminally threatened [the victim] with the separate objective of inflicting *mental or emotional* harm." (*Raymundo M.*, *supra*, 52 Cal.App.5th at p. 95.) As the *Raymundo M.* court observed, "[c]ourts routinely recognize similar distinctions." (*Ibid*. [collecting cases holding section 654 did not apply when the defendant orally threatened the victim and then committed a separate, physically threatening offense like assault].)

12

Like the *Raymundo M.* court, we conclude that defendant's "assault and criminal-threat counts arose from separate conduct that the [trial] court could reasonably have concluded were undertaken pursuant to separate objectives." (*Raymundo M.*, *supra*, 52 Cal.App.5th at p. 95.) As in *Raymundo M.*, the trial court could have reasonably found that defendant threatened S.G. with the intent to cause him emotional or mental harm and assaulted him with the knife with the intent to cause him physical harm. (*Ibid.*) In other words, the trial court could have reasonably found that defendant's objectives in threatening and assaulting S.G. were independent of, and not merely incidental to, each other. (See *People v. Brents*, *supra*, 53 Cal.4th at p. 618; *People v. Mejia* (2017) 9 Cal.App.5th 1036, 1039 (*Mejia*) [threats made during the infliction of physical harm can be punished separately from crimes associated with the physical harm without violating section 654 when the threats are made with a separate criminal objective].)

Defendant's arguments to the contrary and reliance on the trial court's and prosecutor's discussion on jury instructions is unavailing. When defendant threatened to kill S.G. multiple times, which was before, during and after the assault, he intended to instill fear into S.G. When defendant assaulted S.G. with a knife, he intended to physically harm S.G. Defendant lunged and stabbed towards S.G. about 15 times. Thus, his intent in committing the assault was to physically harm S.G. while his threats to kill S.G. was to instill fear in S.G.

As previously noted, a separate objective may exist when a defendant harbors different but simultaneous objectives. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1212

13

[collecting cases]; see *People v. Osband* (1996) 13 Cal.4th 622, 730-731 [the defendant harbored multiple intents when he robbed and raped the victim]; *People v. Booth* (1988) 201 Cal.App.3d 1499, 1502 [the defendant had "dual objectives of rape and theft when entering the victims' residences," which supported the unstayed sentences for burglary and rape].) Thus, where a defendant commits multiple acts and harbors both the intent to cause physical harm and the intent to cause mental or emotional harm, section 654 is inapplicable. (*Raymundo M.*, *supra*, 52 Cal.App.5th at p. 95; *People v. Mejia*, *supra*, 9 Cal.App.5th at p. 1047 [holding section 654 was inapplicable because the defendant's objective in committing torture was to cause physical harm whereas his objective in making criminal threats was to cause emotional harm].)

We therefore conclude the trial court did not err by declining to stay defendant's sentence for his threat offense against S.G. (count 2) under section 654.

IV.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

McKINSTER
Acting P. J.

MILLER
J.

14