Filed 8/11/15  P. v. Smith CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H040188 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C9807357) |
| v. | |
| DAVID REY SMITH, | |
| Defendant and Appellant. | |

In 1999, defendant David Rey Smith was convicted of five felonies:  two counts of pimping (Pen. Code, § 266h, counts 1, 3);[1] one count of pandering (§ 266i, subd. (a)(1), count 4); one count of lewd conduct on a child 14 or 15 years of age (§ 288, subd. (c)(1), count 5); and one count of unlawful sexual intercourse with a minor under the age of 16 by a person over the age of 21 (§ 261.5, subd. (d), count 6).  Smith was sentenced under the Three Strikes law to an indeterminate term of 50 years to life, consisting of consecutive 25 years to life sentences on each of the pimping convictions and concurrent 25 years to life sentences on the three remaining convictions.  In 2013, Smith petitioned for resentencing under the Three Strikes Reform Act of 2012 (Reform Act), passed by the voters as Proposition 36, and requested that counsel be appointed to represent him.  The trial court denied the petition without a hearing and without appointing counsel, concluding Smith was ineligible for resentencing because his conviction for lewd conduct on a child 14 or 15 years old requires mandatory sex offender registration.

---

[1] Unspecified statutory references are to the Penal Code.

On appeal, Smith argues the trial court erred in concluding he is ineligible for resentencing based on only one of his five felony convictions. He further argues the trial court was required to appoint counsel to represent him in connection with his petition for resentencing. Finally, Smith contends he was improperly sentenced to concurrent terms for both lewd conduct and unlawful sexual intercourse in violation of section 654.

We find the trial court improperly denied Smith's petition for resentencing and will reverse the order. Smith's claim he was entitled to appointed counsel prior to the trial court ruling on his petition is therefore moot. Finally, we agree that Smith's concurrent sentences for lewd conduct and unlawful sexual intercourse were unauthorized. Instead, his sentence on the lewd conduct conviction should be stayed under section 654 and, upon remand, we direct the trial court to modify his sentence to comport with that statute.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     *Recitation of facts*[2]

"In October 1998, 17-year-old Malinda M. was a prostitute of 7 or 8 months' experience by the time she met 40-year-old defendant and through him codefendant Derrick Thornton. They came to an arrangement whereby Malinda would work as a prostitute for defendant and, in exchange, she would have a place to live, clothing, and other necessities.

"The home to which defendant and Thornton took Malinda was room 316 at the Rodeway Inn Motel, also called the Santa Clara Motel. Malinda shared the room with defendant and Thornton and two other prostitutes working for defendant, 15-year-old Teresa J. and an older woman named Anne.

---

[2] We recite the facts of Smith's underlying convictions from our opinion in his prior appeal, *People v. Smith* (Mar. 14, 2001, H020142 [nonpub. opn.]), and from the record in that appeal, of which we take judicial notice. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

"Malinda worked essentially every day, all through the evening and night and again for a few hours in the morning. She would go down to a busy intersection at the Alameda in San Jose, sit on a bus stop bench, and smile and wave at passing motorists. If a car stopped, she would get in and set the price. Thornton would sit nearby and watch. When she returned from a customer, she would give the money she earned to Thornton who would turn it over to defendant. Defendant would occasionally perform the function of watcher and collector, but it was usually Thornton's responsibility. It was understood that Malinda was working for defendant even though Thornton collected the money. Defendant gave Thornton an allotment to buy clothes or other items for Malinda and defendant paid for the motel room with the money. Neither defendant nor Thornton worked at other jobs.

"Malinda was expected to earn $200 to $300 each day and was told by defendant that she should charge a minimum of $30. During the three weeks she worked for defendant before her arrest on November 12, 1998, she made approximately $2,000 but she was not allowed to keep any of it.

"Malinda did not like working for defendant because 'he had a bad attitude. He was real bossy.' He hit her on two occasions. The first time, about a week and a half before her arrest, defendant hit her in the left eye with his open hand because she was drinking and being too loud. A blood vessel in the eye burst and she got a black eye. The second incident occurred a couple of days after that when she wanted to leave. Defendant had given her some money, but when she went to collect her clothes, he demanded it back. She refused to return it and defendant hit her and then choked her until she began to lose consciousness.

"Malinda began sleeping with Thornton shortly after moving into the motel room, and within a couple of weeks she started to fall in love with him. She told Thornton she would rather work for him than defendant. Thornton apparently told defendant, because shortly after the choking incident, defendant told Malinda he would release her to work

for Thornton if she would have sex with defendant.  Malinda did not want to have sex with defendant, but she did so one time so that defendant would let Thornton be her pimp.  The switch of pimps took place about three or four days before the arrests.

"Teresa J., a reluctant witness who had attempted to avoid service of process and who testified only under a grant of immunity, gave a similar account of life working for defendant and Thornton.  Two years earlier, she had met Thornton and then she met defendant.  She had worked then for Thornton as a prostitute.  Late in 1998 she bumped into Thornton again in downtown San Jose.  Over the next few days, Thornton and defendant, whom she knew as 'Chicago,' pressured and encouraged her to move in with them and start working as a prostitute again.  She testified that defendant asked her why she was on the street and sleeping under bridges when she could be making money working as a prostitute.

"Teresa worked for both defendant and Thornton who would tell her when and where to work.  She was told to charge a minimum of $60.  On her return from a customer, she would immediately turn the money over to Thornton or defendant so that if she was arrested she would not be caught with the cash on her.  She turned the money over to both men on different occasions, but Thornton was collecting the money for defendant.  Thornton's role was primarily that of guard.  He would watch over the girls while they were on the street.  Thornton also used money from the girls' earnings to buy them clothing and food.  Teresa observed that defendant did not work and rarely left the motel room.

"Teresa earned roughly $200 a day and worked for two or three weeks before being arrested.  She was afraid of defendant because he frequently yelled at her and one time he hit her because he thought she was arguing with him.  If she did not want to work, defendant would yell at her and pressure her to work.  On one occasion, defendant cajoled her into having sex.  She was 15 years old at the time.  She also twice had sex with Thornton.

4

"On November 12, 1998, San Jose Police Officer Mathew Christian was working in the street crimes unit as were Officers Jonathan Kaiser and Christopher Parente. Officer Christian was patrolling the high-prostitution areas when he saw Malinda sitting on a bus stop bench at the Alameda and McKendrie. He observed that she did not board any bus, and instead was looking intently at passing cars with solo male drivers. Officer Christian also observed Thornton sitting on a nearby bench watching Malinda while she sat on her bench. Officer Christian testified that when he saw someone he suspected of being a prostitute, he expected to see a pimp nearby watching over the woman, and he would wait to see if the woman returned after a 'date' and gave money to the suspected pimp.

"On November 12, Officer Christian saw Malinda get into a man's car and drive off. He attempted to follow the car, but lost it. He then returned to where Thornton was waiting in hopes that Malinda would return. While he was waiting, he saw Teresa sit on the same bench as Malinda had. A short time later, Malinda returned and met up with Thornton and Teresa. Officer Christian radioed for backup so that all three suspects could be tailed. He followed Teresa.

"She got on a bus and went to the Santa Clara Motel for about 15 to 20 minutes. She then returned to the original bus stop, as did Malinda and Thornton.

"Thereafter, Officers Kaiser and Parente followed Thornton and Teresa, respectively. Thornton went inside a market and played a video game, then went outside and placed a phone call from a pay phone. Officer Kaiser overheard Thornton ask for 'Chicago.' He then asked, 'Where are the girls?' After receiving a reply, Thornton said he would meet the girls at the church. Thornton, followed by Officer Kaiser, made his way back to the Alameda and McKendrie where he met up with Teresa and Malinda. There is a church on the southeast corner.

"Officer Christian saw Malinda get into another car, and he followed that car for a few blocks and then pulled it over and arrested Malinda for prostitution. He then returned to the starting point, located Thornton a few blocks away and arrested him.

"Officer Parente watched Teresa after Officer Christian left to follow Malinda. She was making eye contact with and waving at solo male drivers. A pickup truck stopped and she got in. He followed the truck to an industrial area where it parked. Officer Kaiser who was also surveilling Teresa arrived. Both of them approached the truck and saw the driver and Teresa sitting with their pants down and their genitals exposed. Officer Kaiser cited the driver and arrested Teresa because she was a juvenile.

"After the three street arrests, Officer Christian went to the motel room where he arrested defendant. Defendant admitted renting the motel room but only for one week. He said he paid half the rent. Malinda and Teresa slept in the living room. He suspected they were prostitutes based on their behavior. Defendant stated that he believed Malinda was 18 and that Teresa was 16. He admitted having sex with Malinda and hitting her in the eye because she was being a pain. Officer Christian found papers in defendant's name and two backpacks with clothes belonging to Malinda and Teresa in the motel room.

"Officer Christian testified that it was not unusual for a prostitute to turn over all her earnings to the pimp. He also stated that in his experience, it was common for pimps to use threats, violence, and intimidation to keep his prostitutes working. He stated it was common for a pimp to set fees, tell the prostitute the minimum amount to charge, and to require a daily minimum income the prostitute must make before she stopped working for the day. In Officer Christian's opinion, the arrangement between defendant and Malinda and Teresa was consistent with the arrangement between a pimp and his prostitutes.

"Officer Karen Asato interviewed Malinda and Teresa. She observed swelling to both sides of Malinda's nose, bruising under both eyes, and the broken blood vessel in one eye. Teresa told her that defendant had taken advantage of her youth and small size

6

to get her to become a prostitute for him. Teresa told Officer Asato that defendant said she had to earn $150 to $200 every day. If she did not want to work, defendant became angry. Teresa felt she had no choice about working as a prostitute because she was very afraid of defendant.

"Defendant presented the testimony of defense investigator Eileen Woods and of Vandalynn Scott, his close friend and the mother of his three-year-old and eight-month-old children.

"Woods testified that Malinda told her that she worked only for Thornton and that she gave her money to Thornton rather than defendant. However on cross examination, Woods stated that Malinda told her that defendant was the one who initially brought her to the motel room, and that both defendant and Thornton threatened to strip search her for money if she ever tried to keep any money from them. Malinda also told Woods that Anne worked as a prostitute for defendant and that he struck and choked her also. Malinda's statement to Officer Asado was consistent with her testimony that defendant required her to have sex with him before he allowed her to work for Thornton; that defendant hit and choked her; that he knew she had previously worked as a prostitute which is why he asked her to come work for him and Thornton; and that she gave her money to Thornton who gave it to defendant. Malinda referred to this system as defendant's 'money plan.' When Malinda wanted to leave, defendant convinced her to stay by promising her more clothing and that she would not have to go out as often. Malinda referred to defendant as her pimp and said she had no other pimps at the same time as defendant and Thornton.

"Vandalynn Scott testified that she saw Teresa J. on the bus three weeks before trial and that Teresa told her that Thornton was her pimp and that defendant was not involved. Scott claimed that defendant was not a pimp but made a living working odd jobs and that she gave him $60 to $100 a week for his expenses. She claimed she saw a paycheck from a shoe repair store where defendant worked. No paycheck nor

7

employment records were produced at trial. The motel room where defendant was staying cost about $300 to $400 a week."

B.    *Conviction*, *sentencing and direct appeal*

The jury found Smith guilty of two counts of pimping (§ 266h, counts 1 & 3), one count of pandering (§ 266i, subd. (a)(1), count 4), one count of lewd conduct on a child 14 or 15 years of age (§ 288, subd. (c)(1), count 5) and one count of unlawful intercourse with a minor under 16 years of age (§ 261.5, subd. (d), count 6). He was sentenced to a total term of 50 years to life, consisting of consecutive 25 years to life sentences on each of the pimping convictions (counts 1 & 3), and concurrent 25 years to life sentences on the pandering, lewd conduct and unlawful intercourse convictions (counts 4, 5 & 6).

On direct appeal, this court affirmed the judgment. (*People v. Smith*, *supra*, H020142 [nonpub. opn.].)

C.    *Smith's petition for resentencing under the Reform Act*

On May 31, 2013, Smith, acting in propria persona, filed a petition for recall of sentence under section 1170.126. The trial court initially denied the petition by written order dated June 5, 2013, finding Smith ineligible for resentencing because "[o]ne of his current convictions was for a violation of . . . § 288[, subdivision] (c)(1)" which "is a serious felony as defined in . . . § 1192.7[, subdivision] (c)(6)." The trial court also noted that Smith was further ineligible for resentencing because that same conviction "is one that requires mandatory [sex offender] registration under . . . [section] 290[,] [subdivision] (c)."

On August 28, 2013, Smith, again in propria persona, moved to "vacate" the court's "judgment" on the ground that the trial court's order inaccurately stated a conviction for violating section 288, subdivision (c)(1) was a "serious felony" under section 1192.7, subdivision (c). He asked that the court reinstate his petition for resentencing and appoint counsel to represent him in connection with that petition.

8

On September 5, 2013, the trial court, after deeming Smith's motion to vacate as a motion for reconsideration, granted reconsideration. The trial court agreed its prior order erroneously determined that Smith's conviction for a violation of section 288, subdivision (c)(1) was a serious felony as defined in section 1192.7, subdivision (c)(6). However, the trial court again denied the petition because Smith's conviction under section 288, subdivision (c)(1) requires mandatory sex offender registration under section 290, subdivision (c). This appeal followed.

## II.    DISCUSSION

### A.    Appealability

Before turning to the merits, we first dispose of the People's argument that the trial court's denial of Smith's petition for resentencing is not an appealable order. After briefing was completed in this case, the California Supreme Court expressly held that an order denying a section 1170.126 petition for recall of sentence is an appealable order under section 1237, subdivision (b). (*Teal v. Superior Court* (2014) 60 Cal.4th 595, 601 (*Teal*).)

### B.    The Reform Act

In the November 6, 2012 election, California voters approved the Reform Act by voting in favor of Proposition 36. Prior to the passage of Proposition 36, the Three Strikes law (§§ 667, subds. (b)-(i), 1170.12) required that a defendant convicted of two prior serious or violent felonies be subject to a sentence of 25 years to life upon conviction of a third felony. As amended by the Reform Act, section 1170.12, subdivision (c)(2)(C), and section 667, subdivision (e)(2)(C), now mandate that, unless certain exceptions apply, a defendant with two or more strikes who is convicted of a felony that is neither serious nor violent be sentenced as a second strike offender.

The Reform Act also added section 1170.126, which allows eligible inmates who are currently subject to 25-years-to-life sentences under the Three Strikes law to petition the court for resentencing. "Section 1170.126, subdivisions (a) and (b), broadly describe

9

who is eligible to file a petition and to be resentenced. Subdivision (a) of section 1170.126 states: 'The resentencing provisions under this section and related statutes *are intended to apply exclusively* to persons presently serving an indeterminate term of imprisonment pursuant to paragraph (2) of subdivision (e) of Section 667 or paragraph (2) of subdivision (c) of Section 1170.12, *whose sentence under this act would not have been an indeterminate life sentence*.' " (*Teal*, *supra*, 60 Cal.4th at p. 598.) "Subdivision (b) of section 1170.126 states: 'Any person serving an indeterminate term of life imprisonment imposed pursuant to paragraph (2) of subdivision (e) of Section 667 or paragraph (2) of subdivision (c) of Section 1170.12 upon conviction, whether by trial or plea, of a felony or felonies *that are not defined as serious and/or violent felonies* by subdivision (c) of Section 667.5 or subdivision (c) of Section 1192.7, *may file a petition for a recall of sentence. . . .*' " (*Id.* at p. 599.)

Subdivision (e) of section 1170.126 addresses eligibility more specifically. It provides that an inmate is "eligible for resentencing" if (1) he or she is "serving an indeterminate term of life imprisonment" imposed under the Three Strikes law "for a conviction of a felony or felonies that are not defined as serious and/or violent felonies"[3] *and* (2) his or her current and prior convictions are not for certain designated offenses. (§ 1170.126, subd. (e)(1); *Teal*, *supra*, 60 Cal.4th at p. 600.) An eligible prisoner "shall be resentenced" as a second strike offender unless the court determines that resentencing him or her "would pose an unreasonable risk of danger to public safety." (§ 1170.126, subd. (f).)

C.     *Smith is eligible for resentencing under the Reform Act*

Smith argues that, even though two of his convictions render him ineligible for resentencing, specifically his convictions for lewd conduct on a child 14 or 15 years of

_____

[3] This requirement is "the same . . . as [that] stated in [section] 1170.126, subd[ivision] (b)." (*Teal*, *supra*, 60 Cal.4th at p. 600.)

10

age and for unlawful sexual intercourse with a minor, he remains eligible for resentencing on his other three convictions--two for pimping and one for pandering--because none of those offenses are defined as a serious or violent felony. Following the close of briefing in this appeal, the California Supreme Court resolved this question in Smith's favor, holding that the Reform Act "requires an inmate's eligibility for resentencing to be evaluated on a count-by-count basis." (*People v. Johnson* (2015) 61 Cal.4th 674, 688 (*Johnson*).)

Accordingly, although Smith's current sentence includes two disqualifying offenses under section 1170.126, subdivision (e)(2), namely lewd conduct with a child age 14 or 15 and unlawful sexual intercourse with a minor, the trial court must evaluate his eligibility for resentencing on a count-by-count basis. Regardless, the trial court ultimately retains the discretion to deny his petition if it finds that "resentencing [Smith] would pose an unreasonable risk of danger to public safety." (§ 1170.126, subd. (f).)

### D. Right to counsel

Smith maintains the trial court violated his constitutional rights by summarily denying his petition for resentencing without appointing counsel.

As discussed above, under *Johnson*, *supra*, 61 Cal.4th at page 688, Smith is entitled to have his eligibility for resentencing evaluated on a count-by-count basis. Consequently, his claim that he was entitled to appointed counsel to argue a legal issue that has been resolved by this appeal is moot.

### E. Section 654

Finally, Smith argues he was improperly sentenced for both lewd conduct and unlawful sexual intercourse in violation of section 654 as both convictions involved the same act, the same victim and the same objective of sexual gratification.[4]

---

[4] Before addressing the substance of Smith's claim of sentencing error under section 654, the People briefly argue that the claim is forfeited as it was not raised in his (continued)

11

Section 654 provides in part, "(a) An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. . . ."  "[I]t is well settled that section 654 applies not only where there was but one act in the ordinary sense, but also where there was a course of conduct which violated more than one statute but nevertheless constituted an indivisible transaction.  [Citation.]  Whether a course of conduct is indivisible depends upon the intent and objective of the actor."  (*People v. Perez* (1979) 23 Cal.3d 545, 551.)  "If [the defendant] entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct."  (*People v. Beamon* (1973) 8 Cal.3d 625, 639.)  " 'The defendant's intent and objective are factual questions for the trial court; [to permit multiple punishments,] there must be evidence to support a finding the defendant formed a separate intent and objective for each offense for which he was sentenced.' "  (*People v. Coleman* (1989) 48 Cal.3d 112, 162.)

It is generally a factual question for the sentencing court whether a defendant's multiple crimes involved multiple objectives.  (*People v. Coleman*, *supra*, 48 Cal.3d at p. 162.)  When the trial court makes no express findings on the issue, its imposition of separate sentence terms may constitute an implied finding that the offenses were divisible.  (*People v. Nelson* (1989) 211 Cal.App.3d 634, 638.)  "A trial court's express or implied determination that two crimes were separate, involving separate objectives,

---

direct appeal in 2001.  However, as the People ultimately acknowledge, an unauthorized sentence, such as one resulting from the failure to follow section 654, may be addressed at any time.  (*People v. Sanders* (2012) 55 Cal.4th 731, 743, fn. 13.)

must be upheld on appeal if supported by substantial evidence." (*People v. Brents* (2012) 53 Cal.4th 599, 618.)

"[M]ultiple sex acts committed on a single occasion can result in multiple statutory violations. Such offenses are generally 'divisible' from one another under section 654, and separate punishment is usually allowed." (*People v. Scott* (1994) 9 Cal.4th 331, 344, fn. 6.) "Even where the defendant has but one objective--sexual gratification--section 654 will not apply *unless the crimes were either incidental to or the means by which another crime was accomplished*." (*People v. Alvarez* (2009) 178 Cal.App.4th 999, 1006, italics added.)

At trial, the 15-year-old victim, Teresa, testified she had sexual intercourse with Smith on one occasion. The prosecutor and Teresa engaged in the following colloquy:

"[Prosecutor]: Was there any other sort of sexual activity? Did he touch you?

"[Teresa]: No.

"[Prosecutor]: He didn't touch you at all?

"[Teresa]: Like, I mean, during or like around?

"[Prosecutor]: During.

"[Teresa]: Yeah.

"[Prosecutor]: Did he touch you on other occasions?

"[Teresa]: No.

"[Prosecutor]: Never laid a hand on you?

"[Teresa]: He hit me once, that was it."

There was no contradictory testimony or evidence presented at trial regarding how Smith touched Teresa while they were engaged in sexual intercourse, nor was any evidence presented of additional touching that might be considered lewd or lascivious conduct under section 288, subdivision (c)(1).

During final argument, the prosecutor discussed the elements of the various charges against Smith, as follows: "The last two counts here are also in ways similar.

13

[*Sic*.] Count Five [i.e., the lewd conduct count] is basically a variation of child molest. The requirements are that the victim, Teresa, be 15 years old. We know that. That the person committing the crime be at least 10 years older. Well, you've got the testimony regarding his date of birth. He's about 40. . . . Second, that there be some touching, and three, that that touching be with the specific intent to arouse or gratify. [¶] *Well, the touching you have here is sex*. Now, a child molest can be something a lot less. It can be the fondling of a breast. It can be the fondling of a butt or thigh. It could be through clothes. So there are other areas where it's a little bit more confusing. [¶] They had sex, sexual intercourse. There's not going to be an issue about touching. There's not an issue about specific intent. When you have sexual intercourse with somebody, it's to gratify one or the other of you, and that's all that matters." (Italics added.)

In its sentencing recommendation, the probation report does not mention section 654, but nonetheless recommended concurrent sentences for counts 5 and 6 since the "crimes . . . occurred at the same time, for the same purpose, and involved the same victim." At the sentencing hearing, the trial court explained it was imposing concurrent terms of 25 years to life on counts 5 and 6, because those offenses "involve[d] the same victim [i.e., Teresa] as Count One." The trial court made no express findings about whether the offenses involved multiple objectives. There was no mention of section 654 by anyone at the hearing.

The People argue that substantial evidence supports the trial court's "implied finding that [Smith] committed two offenses with separate objectives of sexual gratification." We disagree. The only evidence presented regarding Smith's "touching" of Teresa was vague and perfunctory. All Teresa said was that Smith touched her "during" the one occasion they engaged in sexual intercourse. She was not asked to elaborate on that touching in any way, and her imprecise testimony on the matter does not constitute substantial evidence Smith's touching was anything more than incidental to the act of intercourse.

14

Consequently, Smith's sentence on count 5, which carried the lesser potential term of imprisonment,[5] should have been stayed pursuant to section 654.

## III.   DISPOSITION

The order denying Smith's petition for resentencing under Penal Code section 1170.126 is reversed.  The matter is remanded to the trial court for further proceedings in which it shall evaluate Smith's petition on a count-by-count basis.  We further direct the trial court to modify the judgment to impose a stay on count 5 under Penal Code section 654.

---

[5] In 1998, a conviction for committing a lewd or lascivious act on a minor in violation of section 288, subdivision (c)(1) could result in a sentence of one, two or three years, whereas a conviction for unlawful intercourse with a minor in violation of section 261.5, subdivision (d) could result in a sentence of two, three or four years.

_____
                                                                    Walsh, J.*


WE CONCUR:



_____
              Rushing, P.J.




_____
              Elia, J.


_____

    * Judge of the Santa Clara County Superior Court assigned by the Chief Justice
pursuant to article VI, section 6 of the California Constitution.