Filed 8/14/15  P. v. Thongsy CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

|  |  |
|---|---|
| THE PEOPLE, | C075112 |
| Plaintiff and Respondent, | (Super. Ct. No. 62-100613B) |
| v. | |
| SYLA DEBRA THONGSY, | |
| Defendant and Appellant. | |

A jury found defendant Syla Debra Thongsy guilty of pimping Angelica, a minor under the age of 16 (Pen. Code, § 266h, subd. (b)(2); count three),[1] pandering Angelica to become a prostitute (§ 266i, subd. (b)(2); count four), pimping T., a minor over the age of 16 (§ 266h, subd. (b); count five), pandering T. to become a prostitute (§ 266i, subd. (b)(1); count six), and transporting Angelica for the purpose of a lewd act (§266j; count seven).  The jury found defendant not guilty of conspiring to pimp and pander Angelica

---

[1]  Further undesignated statutory references are to the Penal Code.

and T. (counts eight through eleven).**2** The trial court sentenced defendant to nine years four months in state prison, consisting of six years (the middle term) for transporting Angelica for the purpose of a lewd act, a consecutive two years (one-third the middle term) for pimping Angelica, and a consecutive one year and four months (one-third the middle term) for pimping T..  The trial court stayed defendant's sentences for pandering T. and Angelica pursuant to section 654.

Defendant's primary contention on appeal is that the trial court prejudicially erred in failing to sua sponte instruct the jury on contributing to the delinquency of a minor (contributing) (§ 272) as a lesser included offense of pimping, pandering, and transporting a child for the purpose of a lewd act.  She further contends that her conviction for transporting a child for the purpose of a lewd act is not supported by substantial evidence, and that consecutive sentences for pimping Angelica and transporting her for the purpose of a lewd act violate section 654.  Finding no error, we shall affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In the summer of 2010, 16-year-old T. ran away from home.  She met defendant while hanging out at Arden Fair Mall.  After a short conversation, T. asked defendant if they could hang out sometime.  Defendant said yes and gave T. her phone number.  A few days later, T. called defendant and told her that she had been kicked out of her house and needed a place to stay.  Defendant said T. could stay with her, picked T. up, and took

---

**2**  Defendant was tried along with codefendant Stephen Putnam.  In addition to being charged along with defendant in counts three through six and eight through eleven, Putnam alone was charged with communicating with Angelica, a minor, with the intent to commit an unlawful offense (count one) and committing a lewd act upon Angelica (count two).  Putnam is not a party to this appeal, and many of the facts that relate primarily to the charges against him are not included in our recitation of the facts below.

2

her to defendant's mother's home. T. had no money or clothes other than what she was wearing; defendant provided her with clothes, food, toiletries, and shelter.

A few days later, T.'s 15-year-old friend Angelica contacted T. after running away from home, and defendant and T. picked her up and took her to defendant's mother's house. Angelica had no money or clothes other than what she was wearing; defendant provided her with a cell phone, clothes, food, toiletries, and shelter.

T. and Angelica stayed with defendant at defendant's mother's home in Sacramento, at defendant's boyfriend Stephen Putnam's home in Roseville, and at a hotel in Oakland. In addition, on at least two occasions, defendant rented T. and Angelica a room at the Motel 6 in an area known for prostitution, and left them there overnight during which time they "walked the track" looking for men who would pay to have sex with them.[3] T. and Angelica each had sex with men for money and gave at least a portion of their earnings to defendant.

After spending about two weeks with defendant, T. returned home. Angelica left a few days later. Angelica was tearful and apologetic when she returned home and told her mother that she had been prevented from coming home sooner.[4] Angelica's mother contacted Roseville police, and Angelica and her mother met with Officer Philip Mancini, Jr., that evening at the Roseville Police Department. After speaking to Angelica and her mother, Mancini notified Kelby Newton, the sergeant in charge of the department's Vice Narcotics Enforcement Team.

Newton interviewed Angelica later that night and into the following morning. Angelica told him that she had run away from home following a disagreement with her mother, and met up with T. and defendant the next day. Defendant drove T. and

---

[3] The "track" is a place where street prostitution occurs. Tracks are often located near motels.

[4] All references to Angelica's mother herein are to her adoptive mother.

Angelica to Oakland, where defendant had sex with men who had contacted her via "myredbook," a Web site used for prostitution. Angelica had sex with men for money while "working the track" along Stockton Boulevard. Defendant drove by and checked on T. and Angelica while they were walking the track. Angelica gave nearly all of the money she earned to defendant, keeping only a small amount for herself.

Angelica later was interviewed by Angela Ford, an investigator from the district attorney's office. Angelica told Ford that before she went with T. and defendant, T. told her that she was with "this girl," who was "hecka pretty" and "would buy us everything" and "buy me a phone." T. promised Angelica that "we'll have hecka fun" and "go everywhere." Angelica agreed to go with T. and defendant, and defendant and T. picked her up, and took her to defendant's mother's house, and then to Oakland, where defendant first talked to Angelica and T. about prostitution. After returning to Sacramento, defendant twice took Angelica and T. to a Motel 6 off of Stockton Boulevard and Elsie Avenue and rented them a room. Defendant paid for the room using a fake name. Angelica and T. got "dates"[5] walking along Stockton Boulevard. Defendant told her that if a potential date did not touch her "that means they're the police." All the dates took place in the room at Motel 6. Angelica had sex with three men and made about $120 or $160 on the first night and gave all or nearly all of it to defendant. She did not make any money the second night. After T. and Angelica "pulled a trick,"[6] they had to call defendant, and defendant would come by and pick up the money. If they got hungry during the night, defendant would bring them food. Angelica knew that T. had been walking the track "for a while" because T. told everyone what she had been doing. When Ford asked Angelica what defendant did to convince her to

---

[5]  In the world of prostitution, a "date" refers to the "actual event that's happening between the prostitute and the customer."

[6]  A "trick" is a customer who sees a prostitute for their services.

engage in prostitution, Angelica responded, "[N]othing really," explaining that defendant asked her, "Are you here to stay," and Angelica indicated that she was. It was not until later that defendant said, " 'Well, y'all can go out on the track,' and other stuff like that." Angelica explained that she could not say no because defendant "didn't really just like, say, 'Your -- or do you wanna go out on the track,' or anything. She just kinda -- kinda made me go." Defendant provided Angelica with alcohol and T. with alcohol and cocaine.

At trial, Angelica testified that T. told her that she was living with a "porn star" who was buying her all types of things and taking her places. After defendant and T. picked her up, defendant drove them to Oakland, where defendant said she was shooting music video. Defendant provided Angelica with a cell phone and bought her clothes and toiletries. While they were in Oakland, defendant told Angelica and T. that she was a prostitute and that she wanted Angelica and T. to do the same. Defendant said that she wanted them to make an advertisement for the myredbook Web site, and that they were "going to be walking the track." Defendant provided Angelica with alcohol the entire time Angelica was with her, and Angelica saw defendant and T. doing cocaine obtained by defendant. Angelica and T. stayed at Motel 6 when they walked the track along Stockton Boulevard. The first time they walked the track, defendant drove T. and Angelica to the motel around 10:00 p.m., rented them a room while they sat in the car, accompanied them to the room, did Angelica's makeup, then dropped them off at a gas station near Stockton Boulevard. Angelica wore a dress defendant bought for her. Defendant told them to charge $80 for either sex or oral sex and $100 for both and to call her when they got the money and she would come pick it up. Angelica had sex with three men and was paid over $100. She did not count the money because she knew she was not going to keep it; she had to give it to defendant "[b]ecause she's the head." A few days later, defendant drove them back to the Motel 6, rented them a room, and left.

5

Angelica and T. went out to the track, but it was a slow night, and Angelica did not have any dates.

On cross-examination, Angelica acknowledged knowing that T. was a prostitute before agreeing to go with T. and defendant. T. had told her about "[w]alking the track, tricks she met, all types of stuff." Angelica also acknowledged that she chose to stay with defendant because she did not want to go home; she was not forced to stay. She was never asked if she wanted to be a prostitute; rather, she felt that was something she had to do if she chose to stay.

A few days after Angelica and her mother met with Officer Mancini, T. was interviewed at her home by Detective David Buelow. T. acknowledged knowing defendant and staying at various motels while she was with defendant, but she denied engaging in prostitution. Angelica engaged in prostitution, but she decided to do so on her own. Defendant had nothing to do with it.

Several months later, T. was interviewed by Investigator Ford. Initially, T. was "evasive" and "untruthful," so Ford decided to employ a ruse. She told T. that video cameras at the motel might show whom she was with while she was there. At that point, T. broke down and began to talk about the two nights she spent at the Motel 6 with Angelica. T. estimated that she "turned four or five tricks . . . and . . . made $75 for each blow job and $50 for regular sex." She made a total of $350 and gave defendant half. Her aim was to give defendant as little as possible, and she advised Angelica to do the same. She gave defendant the money because defendant told her that she could not continue to live off defendant for free. When T. gave defendant the money, defendant asked if she had only done "one trick" and indicated that she needed to charge more money. T. indicated that "it was at [defendant's] direction that she had sexual contact with the males."

Ford interviewed T. a second time a few months later. T. said that she gave defendant $60 on one occasion and $40 on another. Defendant provided her and

6

Angelica with condoms and told her not to charge anything less than $100 and to "allow the person who pulls up to them to touch them first . . . [to] weed out the undercover cops." Defendant spoke to her about doing a photo shoot and about advertising on the myredbook Web site as an alternative to walking the track.

At trial, T. testified that she "had an idea" defendant was a prostitute but did not know for sure. She denied talking to Angelica about where T. had been or whom she had been with. She simply said that she was with a friend and was somewhere safe. The night they returned from Oakland, defendant rented T. and Angelica a room at the Motel 6 on Stockton Boulevard. The area along Stockton Boulevard where the motel is located is known as the "ho strip." "Ho" means prostitute. T. and Angelica stayed in the room that night, and defendant picked them up the following morning. Defendant drove them back to the Motel 6 the next night, rented them a room, and told them that they could not continue to live off her for free. T. and Angelica spent two nights in the room. The first night they had some friends over, and the second night they "walked down Stockton Boulevard." Before doing so, they ingested alcohol and/or drugs provided by defendant. They "got tricks and . . . took them back to [the] hotel room" and had sex with them for money. Defendant did not give them any advice "at that time regarding the ho strip." No one told them what to charge, they just said a price. T. knew to go to Stockton Boulevard because she had seen activity that looked like prostitution in the area. T. had sex with three men that night. Each paid her money, which she put under the bed. She made $150. Defendant returned the next morning, and T. told her that they had walked on Stockton Boulevard and received money. Defendant responded, "Okay." Defendant did not ask for any money, and T. did not give her any money. They left the motel that morning and returned to T.'s mother's house where they showered and changed clothes. Later that night, defendant drove them back to the Motel 6 and rented them a room. Prostitution was not discussed. That night, T. and Angelica slept in the room. They did not go back out onto Stockton Boulevard because they chose not to. Defendant returned

7

the next morning and asked if they went out that night, and they told her they did not. Referring to the previous night, defendant asked, "What did you guys make?" T. was not truthful in her response and gave defendant $40. Defendant did not ask for it. Angelica did not give defendant any money. After learning that T. and Angelica were engaged in prostitution, defendant asked them what they were charging, and they told her $100. Defendant responded, "Keep it at that, don't go lower." Defendant also advised them to have potential customers touch them to make sure they are not undercover police officers, explaining that police officers cannot touch prostitutes.

Later that day, T. texted defendant and asked, "Can you get me a room tonight so I can work since it was hella hot last night." By hot, she meant that "[t]here were a lot of police officers out." That night, defendant drove T. and Angelica to the Motel 6, rented them a room, and T. and Angelica "went out on Stockton Boulevard [them]selves." T. had one customer that night and estimated she was paid $75, which she spent the next day. T. gave defendant $40 on one occasion and $60 on another.

Defendant told T. and Angelica that if they chose to be prostitutes, the Internet would be safer. Defendant provided T. and Angelica with alcohol, marijuana, and cocaine because they asked for it. T. acknowledged that she was untruthful in her interview with Detective Buelow when she stated that "she did not know anything that had occurred." She explained that she was trying to protect defendant because of what defendant had done for her. She also stated that she was not entirely truthful when speaking to Investigator Ford because she was trying to protect herself. She was afraid of getting into trouble because Angelica's mom had threatened to press charged against her for influencing Angelica.

During cross-examination, T. confirmed that no one forced her to run away, to stay away, or to engage in prostitution. She denied telling Ford that she prostituted herself at defendant's direction. She did tell Ford that she made $350 and gave defendant half, but that was a lie. She actually gave defendant $40. She also denied engaging in

8

prostitution before or after the summer of 2010.  The only time she ever prostituted herself was during the two nights she spent with Angelica at the Motel 6.

Defendant was detained shortly after Angelica and her mother met with Officer Mancini.  Her cell phone was seized and eventually searched.  It contained text messages from T. stating that Angelica was "snitching," that T. would not snitch, and that T. was going to say that she did not know anything.  Police were also able to extract images from defendant's phone stating, "Yes my girls are pretty bitches," and "Ladies is pimps too."

Sacramento Police Detective Derek Stigerts testified for the prosecution as an expert in the areas of prostitution and pimping in general, victimology, and methods of recruitment and control.  Stigerts spent the past six years on loan to the Federal Bureau of Investigation (FBI), working on the Innocence Lost Task Force dealing with juvenile prostitution.  He opined that underage prostitutes are usually runaways "looking for someone to take care of them because they didn't have that where they were before." They are recruited using promises of nice things, housing, and clothing.  Once a girl is provided these things, she is often told something like, "I've been providing you food and housing, all those things, now you need to help me out and this is what I need you to do." Juveniles are a rich target because of their inability to take care of themselves or easily go out and get a legitimate job.  Runaways often have no other place to go; they are on the street and struggling to get by.  According to Stigerts, the sole purpose of pimping is money, and "if a girl can bring in another girl to make more money for that pimp, then that girl who brought that other girl in is going to be thought of as doing good."  A prostitute can also be a pimp.  The "top prostitute" that works for a pimp is sometimes referred to as the "bottom girl."  Bottom girls have a variety of responsibilities including recruiting, collecting money, renting rooms, and generally "control[ling] the girls."  The myredbook Web site is the most commonly used prostitution Web site in Northern California.  It has no legitimate purpose; it is used solely for advertising and soliciting

prostitution.  The area along Stockton Boulevard and Elsie Avenue is "a well-known prostitution track in Sacramento County."

DISCUSSION

I

The Trial Court Did Not Err in Failing to Instruct the Jury on Contributing to the Delinquency of a Minor as a Lesser Included Offense of Pandering, Pimping, and Transporting a Child for the Purpose of a Lewd Act

Defendant contends that the trial court erred in failing to instruct the jury on contributing as a lesser included offense of pandering, pimping, and transporting a child for the purpose of a lewd act (counts three through seven).  We disagree.

"A trial court has a sua sponte duty to 'instruct on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser.'  [Citation.]  Substantial evidence in this context is evidence from which a reasonable jury could conclude that the defendant committed the lesser, but not the greater, offense.  [Citation.]" (*People v. Shockley* (2013) 58 Cal.4th 400, 403-404 (*Shockley*).)  In reviewing the sufficiency of the evidence for this purpose, we resolve any doubts in defendant's favor.  (*People v. Tufunga* (1999) 21 Cal.4th 935, 944; *People v. Barnett* (1998) 17 Cal.4th 1044, 1151.)

"To determine if an offense is lesser and necessarily included in another offense . . . , we apply either the elements test or the accusatory pleading test.  'Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former.  Under the accusatory pleading test, if the facts actually alleged in the accusatory pleading include all of the elements of the lesser offense, the latter is necessarily included in the former.' [Citation.]" (*Shockley, supra*, 58 Cal.4th at p. 404.)  "When applying the accusatory pleading test, '[t]he trial court need only examine the accusatory pleading.'  [Citation.] '[S]o long as the prosecution has chosen to allege a way of committing the greater offense that necessarily subsumes a lesser offense, and so long as there is substantial

10

evidence that the defendant committed the lesser offense without also committing the greater, the trial court must instruct on the lesser included offense.' [Citation.]" (*People v. Banks* (2014) 59 Cal.4th 1113, 1160, overruled on other grounds by *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3.) We review independently whether the trial court improperly failed to instruct on a lesser included offense. (*Ibid.*)

We begin our analysis with the pandering charges. As relevant here, a person who "by promises, threats, violence, or by any device or scheme, causes, induces, persuades, or encourages another person to become a prostitute" is guilty of pandering. (§ 266i, subd. (a)(2).) Subdivision (b) of section 266i imposes additional penalties where the victim is a minor. Counts four and six of the amended information charged defendant with "unlawfully, and by threats, violence, promises, a device, or scheme," causing, inducing, persuading, or encouraging Angelica and T., minors, to become prostitutes.

Section 272 defines contributing as "any act . . . which . . . causes or tends to cause or encourage any person under the age of 18 years to come within the provisions of Section 300, 601, or 602 of the Welfare and Institutions Code or which act . . . contributes thereto, or . . . to do or to perform any act or to follow any course of conduct or to so live as would cause or manifestly tend to cause that person to become or to remain a person within the provisions of Section 300, 601, or 602 of the Welfare and Institutions Code. . . ." "Thus, one contributes to the delinquency of a minor by bringing a minor within the reach of Section 300, 601, or 602 of the Welfare and Institutions Code." (*People v. Vincze* (1992) 8 Cal.App.4th 1159, 1163, fn. omitted (*Vincze*).) Section 602 of the Welfare and Institutions Code confers juvenile court jurisdiction over minors who commit crimes. Engaging in an act of prostitution is a crime. (§ 647.)

In *People v. Mathis* (1985) 173 Cal.App.3d 1251, 1257 (*Mathis*), the court held that while contributing is not a lesser included offense of pandering in the abstract insofar as the pandered prostitute need not be a minor, it was a lesser included offense to the offense of pandering in that case where the information alleged the victim's age with

11

respect to the pandering offense. Here, as in *Mathis,* the amended information alleged that Angelica and T. were minors. Thus, it is evident that under the accusatory pleading test contributing is a lesser included offense of pandering as charged in counts four and six.

We next consider whether there is substantial evidence that defendant is guilty only of contributing and not pandering. (*Shockley, supra,* 58 Cal.4th at pp. 403-404.) Defendant argues that there is substantial evidence that "she merely provided advice -- she was not a panderer," and that "engaging in prostitution was [T. and Angelica's] idea." The problem with defendant's argument is that if she merely provided advice to T. and Angelica concerning prostitution, as opposed to encouraging them to engage in it, she would not be guilty of either contributing or pandering. Because there is no substantial evidence that would support a finding that defendant is guilty of the lesser offense contributing but not the greater offense of pandering, the trial court did not err in failing to instruct the jury on contributing as a lesser included offense of pandering. (*Shockley, supra,* 58 Cal.4th at pp. 403-404.)

Next, we address the pimping charges. As relevant here, "any person who, knowing another person is a prostitute, lives or derives support or maintenance in whole or in part from the earnings or proceeds of the person's prostitution . . . is guilty of pimping . . . ." (§ 266h, subd. (a).) Subdivision (b) of section 266h imposes additional penalties where the victim is a minor. Counts three and five of the amended information charged defendant with living and deriving support and maintenance in whole or in part from money Angelica and T. earned as prostitutes, knowing they were minors and prostitutes. We have been unable to find a case that addresses whether contributing is a lesser included offense of pimping, and the parties have not cited any such cases. Contrary to defendant's assertion, this issue was not decided in *Mathis*. In *Mathis*, the court considered whether contributing is a lesser included offense of pandering, not pimping. (*Mathis, supra*, 173 Cal.App.3d at p. 1257.) We need not decide here whether

12

contributing is a lesser included offense of pimping as alleged in the amended information because even assuming that it is, there is no substantial evidence that defendant is guilty of only contributing and not pimping.

Defendant argues that there is substantial evidence that "[a]ny money given to [her] was not given to her as a pimp but to reimburse her in small part for [T. and Angelica's] expenses." As previously stated, a person is guilty of pimping under section 266h, subdivision (a), when he or she, "knowing another person is a prostitute, lives or derives support or maintenance in whole or in part from the earnings or proceeds of the person's prostitution . . . ." Here, the only evidence is that defendant knew that T. and Angelica were engaged in prostitution and that the money they gave her was a product thereof. The issue is whether defendant lived or derived support in whole or in part from that money.

"[T]he amount of money which [a] defendant receives from the prostitute is irrelevant for purposes of a pimping conviction." (*People v. Jackson* (1980) 114 Cal.App.3d 207, 210.) Additionally, " '[i]n order to establish that the accused lived and derived support and maintenance from the earnings of prostitution it is not necessary for the prosecution to prove that the money was expended for that purpose.' " (*Ibid.*) Thus, even assuming the money T. and Angelica gave defendant was intended as reimbursement for their expenses, many of which were directly related to prostitution, that does not mean that defendant did not live or derive support from such money. This is not a case where a defendant merely held or saved money given to her by a prostitute. The only reasonable inference on the evidence before us is that defendant used it to live on. Because there is no substantial evidence that defendant is guilty only of contributing and not pimping, the trial court did not err in failing to instruct the jury on contributing as a lesser included offense of pimping. (*Shockley, supra,* 58 Cal.4th at pp. 403-404.)

Finally, we consider whether contributing is a lesser included offense of transporting a child to another for the purpose of a lewd act. Pursuant to section 266j,

13

"any person who intentionally gives, transports, provides, or makes available, or who offers to give, transport, provide, or make available to another person, a child under the age of 16 for the purpose of any lewd or lascivious act as defined in Section 288, or who causes, induces, or persuades a child under the age of 16 to engage in such an act with another person, is guilty of a felony . . . ." Count seven of the amended information charged defendant with "willfully and unlawfully giv[ing], transport[ing], provid[ing], or mak[ing] available to another person [Angelica], a child under the age of 16, for the purpose of any lewd or lascivious act . . . ." While we have been unable to find a case that addresses whether contributing is a lesser included offense of child procurement, we have found cases holding that contributing is not a lesser included offense of unlawful sexual intercourse or lewd and lascivious conduct (§ 288, subd. (a)) and find the reasoning of those cases applicable here. (*Vincze, supra,* 8 Cal.App.4th at p. 1162; *People v. Bobb* (1989) 207 Cal.App.3d 88, 92, disapproved on other grounds by *People v. Barton* (1995) 12 Cal.4th 186, 198.)

In *Vincze,* which involved the offense of lewd and lascivious conduct, the court explained: " 'As lewd and lascivious conduct has no necessary relationship to curfew violations or habitual truancy--the remaining bases of juvenile court jurisdiction under [Welfare and Institutions Code] section 601 [following a 1975 amendment thereto]--that statute cannot support the conclusion that lewd and lascivious conduct necessarily contributes to the delinquency of a minor." (*Vincze, supra,* 8 Cal.App.4th at pp. 1163-1164.) The *Vincze* court also concluded that committing lewd and lascivious acts on a child does not bring the child within section 602 of the Welfare and Institutions Code, which "confers juvenile court jurisdiction over minors who commit crimes, not children who committed no crime." (*Vincze,* at p. 1164.) Finally, the *Vincze* court found that committing lewd and lascivious acts on a child did not bring the child within section 300 of the Welfare and Institutions Code, which places within the jurisdiction of the juvenile court minors who suffer physical injury, sexual abuse or emotional damage as a result of

14

parental conduct or neglect, explaining that "[w]hile a neglected child may be sexually abused, neglect is not necessarily present in every instance of lewd and lascivious conduct." (*Vincze,* at p. 1164.)

The *Vincze* court's analysis concerning why contributing is not a lesser included offense to performing lewd and lascivious acts on a child is equally applicable to a charge of transporting a child for the purpose of a lewd act. Neglect is not necessarily present in every instance of transporting a child for the purpose of a lewd act; thus, committing such an act does not necessarily bring the child within section 300 of the Welfare and Institutions Code. Likewise, a child who is transported for the purpose of a lewd act is not necessarily engaging in a criminal act but often is a crime victim; thus, committing such an act does not necessarily bring the child within section 602 of the Welfare and Institutions Code. Nor does transporting a child for the purpose of a lewd act have any relationship to the bases for juvenile court jurisdiction under section 601 of the Welfare and Institutions Code (persistently or habitually refusing to obey parents, curfew violations, and habitual truancy). Because providing or transporting a child for the purpose of a lewd act does not necessarily bring children within the reach of section 300, 601, or 602 of the Welfare & Institutions Code, such conduct does not necessarily contribute to the delinquency of a minor to the extent of imposing an instructional duty on the court. This is true under both the elements and accusatory pleading tests insofar as the allegations in the amended information track the language of section 266j. Because contributing is not a lesser included offense of transporting a child for the purpose of a lewd act, the trial court did not err in failing to so instruct the jury.

II

Substantial Evidence Supports Defendant's Conviction for Transporting a Child for the Purpose of a Lewd Act

Defendant next contends that the evidence is insufficient to support her conviction for transporting a child for the purpose of a lewd act. Again, we disagree.

15

In addressing defendant's claim, we "must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence — that is, evidence which is reasonable, credible, and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) We accord due deference to the verdict and will not substitute our conclusions for those of the trier of fact. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078.) A conviction will not be reversed for insufficient evidence unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)

Defendant claims there is insufficient evidence to support her conviction for transporting a child for the purpose of a lewd act because the evidence merely showed that she transported Angelica to a place rather than to another person. We are not persuaded. As the People correctly note, defendant "did not simply transport Angelica to 'a place.' Rather, [defendant] intentionally transported Angelica to a location where prostitution regularly occurred and willing customers lurked." The evidence showed that defendant drove Angelica to a motel located in an area known for prostitution, rented her a room, did her makeup, and then dropped her at a gas station near the track, a place where people go when they are looking to pay for sex. On this record, we have no trouble concluding that there is substantial evidence to support a finding that defendant intentionally transported Angelica to another person for the purpose of a lewd and lascivious act within the meaning of section 266j.

### III
### The Trial Court Did Not Err in Punishing Defendant for Both Pimping Angelica and Transporting Her for the Purpose of a Lewd Act

Lastly, defendant contends that section 654 prohibits punishment for both pimping Angelica and transporting her for the purpose of a lewd act (counts three and seven)

16

because both crimes were incident to a single criminal objective, namely "to use Angelica as a revenue source." We disagree.

The trial court imposed a two-year term for pimping Angelica (count three) and ordered that it run consecutive to the six-year term it imposed for transporting her for the purpose of a lewd act (count seven) because "pimping, was a separate objective than the driving the ladies around. [Defendant] used her vehicle in this operation and more than just above pimping and pandering. She used the vehicle -- she transported these young women on multiple occasions. I think it's an independent objective."

Section 654 prohibits separate punishment for multiple offenses arising from the same act or from a series of acts constituting an indivisible course of criminal conduct. (*People v. Williams* (2013) 57 Cal.4th 776, 781; *People v. Rodriguez* (2009) 47 Cal.4th 501, 507.) " 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " (*Rodriguez*, at p. 507, italics omitted; accord, *People v. Lewis* (2008) 43 Cal.4th 415, 519.) However, "a course of conduct divisible in time, though directed to one objective, may give rise to multiple convictions and multiple punishment 'where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken.' [Citation]." (*People v. Lopez* (2011) 198 Cal.App.4th 698, 717-718.) "The trial court has broad latitude in determining whether section 654, subdivision (a) applies in a given case." (*People v. Garcia* (2008) 167 Cal.App.4th 1550, 1564.) "A trial court's express or implied determination that two crimes were separate, involving separate objectives, must be upheld on appeal if supported by substantial evidence." (*People v. Brents* (2012) 53 Cal.4th 599, 618.)

17

Here, the evidence showed that defendant transported Angelica to the Motel 6 for the purpose of a lewd act on two separate occasions in violation of section 266j, and that on one of those occasions Angelica did not earn any money from prostitution. The trial court reasonably could have concluded that the transporting of Angelica on the occasion she did not earn any money and pimping Angelica were divisible in time insofar as they occurred on different days and that separate punishments were warranted. (See *People v. Lopez, supra,* 198 Cal.App.4th 698, 717-718.)

DISPOSITION

The judgment is affirmed.


                                                                    BLEASE                  , J.


We concur:


      RAYE                , P. J.


      MURRAY            , J.